# IN THE SUPREME COURT OF IOWA

No. 17–0007

Filed June 14, 2019

**CATHRYN ANN LINN,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Muscatine County, Nancy S. Tabor, Judge.

Cathryn Ann Linn seeks further review of a summary disposition in her postconviction-relief proceeding. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Darrell G. Meyer, Marshalltown, (until withdrawal), and then Thomas A. Hurd of Glazebrook & Hurd, LLP, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, Alan R. Ostergren, County Attorney, and Korie L. Shippee, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, an applicant for postconviction relief (PCR), Cathryn Ann Linn, claimed in the proceeding below that her trial counsel was ineffective for not adducing evidence of battered woman syndrome (BWS).[1] To prove the claim, she sought a court-appointed BWS expert.

After Linn waited more than a year to learn whether the district court would appoint an expert, the State moved for summary disposition. The district court then denied Linn's request to appoint an expert and, in the same order, cited her failure to provide an expert in granting summary judgment for the State.

Linn appealed, assigning error to those rulings and claiming ineffective assistance of PCR counsel. The court of appeals affirmed, and we granted further review.

We hold the district court abused its discretion in denying the expert. We also hold the summary disposition was erroneous. The district court's errors include (1) viewing the facts in the light most favorable to the moving party instead of the nonmoving party as required by our law; (2) drawing inferences in favor of the movant instead of the nonmovant as required by our law; (3) relying on the lack of an expert in the very order that the court first addressed, and denied, Linn's request for appointment of an expert; and (4) concluding the record did not show facts to support Linn's claim that BWS should have been raised at her trial in spite of a trial transcript with evidence of physical, psychological, and verbal abuse of the type that causes BWS.

This case does not call upon us to decide whether Linn suffered BWS. This is especially true on review of a summary disposition, when

---

[1]Linn also raised other claims in the proceeding below, but her appeal does not address those claims. We express no opinion on the unaddressed claims.

the question before us is merely whether there is a genuine dispute that Linn's trial counsel was ineffective. Answering that question requires us to consider whether Linn *might* be a BWS victim.

We vacate the court of appeals' decision, reverse the district court's judgment, and remand to the district court for further proceedings.

## I. Factual Background.

The summary disposition record shows the following facts.[2] Linn was approximately forty-two years old in 2006. She is from Muscatine County. Barry Blanchard was also from the Muscatine County area but moved around after high school. He returned to Muscatine County in the fall of 2006.

Linn and Blanchard began dating in the fall of 2006. They had dated for a short while a couple decades earlier. Their more recent relationship began well, and they saw each other a lot. Linn felt they were in love. Linn told Jeff Scott, Blanchard's friend, that she and Blanchard got along great and that she really liked him. Linn cared for Blanchard, gave him money, and let him use her food stamp card even though he would spend her money and not bring back change. During this time, Blanchard had access to most of Linn's financial resources.

---

[2]The summary disposition record includes, among other things, the transcript of Linn's criminal trial. The summary disposition record does not contain a number of pieces of evidence which the trial transcript suggests were admitted into evidence, including an audio recording of Linn's 911 call, a video or audio recording from a police officer's squad car and body camera or microphone, an audio recording of an interview with Linn at the police station, a portion of a video recording of that interview, a physical model of the crime scene, and photographs of Linn and the crime scene. When a PCR application is not accompanied by the record of the challenged proceedings, the State has the responsibility to file any material portion of that record. Iowa Code § 822.6 (2016). Our review of a summary disposition grant is limited to the record before the summary disposition court. *See* Iowa R. Civ. P. 1.981(3); *Moon v. State*, 911 N.W.2d 137, 142 (Iowa 2018); *Banwart v. 50th Street Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018). The State, however, did submit a copy of the court of appeals opinion on direct appeal into the PCR record without objection. Without deciding the issue, we consider the facts as stated in the court of appeals opinion to be part of the PCR record.

At the same time, Blanchard threatened and struck her. He warned, "[N]obody else [is] going to ever have you." And, according to Linn's trial testimony,

> He'd always – he had always told me that he would cut me from my [stem to stern and rape me] while I was still bleeding, and he had told me that [on] several occasions. Clotheslining[3] me, making me repeat it to him. Probably more than 15, between 15 and 20 times I had to repeat it, or he would say it to me.

Then he would kiss her.

Blanchard also told Linn of previous violence, including that he killed someone in California, killed people in the military, and beat his ex-partner, Vicki Espinoza, "within an inch of her life." An officer who responded to a domestic assault between Blanchard and Espinoza in 1999 described Espinoza's face as bloody and bruised. One year earlier, Blanchard was charged with simple assault for fighting with Espinoza's ex-husband. In 1995, Blanchard dared a police officer, "Go ahead and mace me," before being taken into police custody on a disorderly conduct charge. Blanchard warned Linn that knowing his history, she "better not f***ing piss him off." Blanchard had a reputation for being tough and intimidating people.

In the beginning of their relationship, Linn did not take Blanchard's threats and potential for violence against her seriously. She thought he was showing her dominance because he knew that she liked to be dominated. Linn consented to certain rough sex acts with Blanchard; if

---

[3]The meaning of the reference to "clotheslining" in the record is ambiguous. Based on the context in which it is used by Linn, it appears to refer to "[s]triking another person across the face or neck with an extended arm." *Clothesline* (*disambiguation*), Wikipedia.org (last edited May 25, 2015), https://en.wikipedia.org/wiki/ Clothesline_(disambiguation) [http://perma.cc/X2TV-3EML]. *See generally* Lee F. Peoples, *The Citation of Wikipedia in Judicial Opinions*, 12 Yale J.L. & Tech. 1, 50 (2009) (noting that Wikipedia can be useful to define slang terms and get a sense of a term's common usage).

the two were already engaged in sexual intercourse she allowed Blanchard to put his hands around her throat to temporarily decrease oxygen flow. Still, Linn made clear to Blanchard that physical aggression when they were not having sexual intercourse was unacceptable. "[G]rabbing [Linn] in a physically aggressive manner" was not "part of a mating ritual." Linn never had any type of physical encounter with Blanchard that would have led him to believe that coming into her room and strangling her was part of a sexual act.

They drank to the point of intoxication much of the time they were together. At times, they also used methamphetamine.

Linn owned a rifle that belonged to her ex-husband before he committed suicide. She knew how to use the weapon and was not afraid of it. She took weapons safety courses. Blanchard knew of the rifle and would often take it out to show off to his friends.

After Linn and Blanchard began their relationship in the fall of 2006, Blanchard was arrested on Thanksgiving Day for an outstanding warrant. He was imprisoned for forty-five days.

While Blanchard was in prison, he was "adamant" that "he would hurt [Linn] or any other individual if he found [her] with another individual" or "if [he] even [thought she was] with another individual." Also during this time, Linn had gallbladder issues and complications from surgery which continued until at least February 6.

When Blanchard got out of jail, he and Linn continued their relationship. Blanchard began residing at Linn's house the day he got out of jail.

Towards the end of January 2007, approximately two weeks before February 6, Linn told Blanchard that the relationship was not working and he had to move out. He acceded and continually told her that he would

move out.  But during the two weeks before February 6, he did not do so.  She "kept thinking okay, he said today's the day, today's the day, today's the day.  Two weeks . . . passed with today's the day."  Linn made some calls to nearby shelters or gave Blanchard information to make the calls himself.  Blanchard skipped appointments in which he was to talk with people at shelters.  Linn asked him to stay with his friend Scott or with his family, but "he told [her] no . . . and he just did not leave."  Linn also tried to help Blanchard get a job, but he did not follow through.

Once she told him that their relationship was at its end, Linn became scared and intimidated by Blanchard because of his threats and stories of previous violence.  Linn explained that "during this last month period, and the last two-week period, . . . [she] just wanted to get out safe.  [She] didn't want it to ever turn violent.  [She] just wanted [them] to part ways."  She "had no reason not to believe that he would kill [her]. . . .  He was very adamant about letting [her] know that if [she] messed up, [she] would be dead."  Yet Linn did not like involving the police.  And during the two weeks before February 6, they were not fighting to the point that she needed to call the police to have Blanchard removed from the home.

Additionally, after she told Blanchard that their relationship was over, Linn began noticing that Blanchard was taking some of her possessions.  These included her money, medicine, and cigarettes.  She began hiding these things.

On February 6, Blanchard called his friend Scott.  Blanchard told Scott that he and Linn were splitting up, it was mutual, he was moving out, and he would go to California if he did not get a job within a week.  Blanchard also called Kim Crees, Scott's girlfriend and Linn's acquaintance, that morning.  He told her that he and Linn were splitting

up and they were not fighting; rather, it just was not working out and he was excited that he got a job for the day shoveling snow.

Later that day, in the afternoon, Linn called Blanchard en route to her home after a visit to an Iowa City hospital. Blanchard told Linn that he could not move to a shelter because of something in his past.

Upon Linn's return to her home, she found Blanchard on the sidewalk near the house holding a shovel. Blanchard told Linn he had nowhere to stay that night and asked if he could sleep in her car or porch. Linn understood this request in the context that "he knew [her] persona well enough that [she] would not allow that to happen." Linn believed "[Blanchard] knew [she] would say no" to him spending the night in the car or on the porch. Linn allowed him to spend the night on a couch in the living room of her home because it was bitter cold outside. That allowance was not an invitation for him to spend the night in her bed or to have sex with her.

Blanchard left in the afternoon to work a snow shoveling job and came back to her house later that evening. Because of her medical issues, Linn was experiencing "[n]ausea, pain. [She] couldn't do a lot of walking around and lifting. [She] laid down, [she] was in bed a lot, laying down. Throwing up some. . . . Lots of pain." She spent much of the afternoon while Blanchard was gone cuddling with her son on the couch. Blanchard returned to the house sometime between 6:00 p.m. and 6:30 p.m. He offered her the money he earned. She refused and said he should keep it because he was going to be starting out on his own. Linn took her son to his father's house at 7:00 p.m. Linn retired to her bedroom to read while Blanchard listened to heavy metal music in the living room.

Blanchard left to buy alcohol. When he returned, she heard him open a can, she asked if it was beer, and when he said yes, she went to

the refrigerator and retrieved one. Then she went back into her bedroom to read. At trial, Linn estimated it was between 8:15 p.m. and 8:30 p.m. at this point.

Sometime later, Blanchard came into Linn's room and offered her marijuana. She smoked some of the marijuana.

Blanchard asked Linn to get drugs for them—"[p]robably coke or meth"—and became agitated when she refused. Linn did not want to jeopardize her situation with her children and could not afford to spend any money on the drugs. Blanchard's disposition changed and tension built. He kept asking her throughout the night to call someone for drugs, and she continued to refuse.

Up until that point, according to Linn, they had not had "any cross words" all day. Yet they "were still real kind of cold with each other, him knowing that tomorrow he would be leaving." Eventually, Linn went to the living room to talk to Blanchard. She said, "I'm not feeling good about us not even talking tonight," and "[W]e've been in a short relationship." Linn suggested, "Why don't we just get some beer and get along tonight . . . instead of putting the last night that we're going to be together into this feeling." Linn explained at trial that "it was an ugly feeling for [her] inside" because she "did care for [Blanchard]," but she "played the tape a little bit farther down the road[] and was certain [there were] other issues relating to [their] relationship [that she] could not take . . . on."

They decided to try to end their relationship on friendly terms and drink alcohol together. So Blanchard left at about 9:40 p.m. to buy vodka, beer, and cigarettes. While he was out, Linn hid her billfold, food stamp card, and a cigarette. Blanchard arrived with alcohol and cigarettes but forgot some of the alcohol so he had to go back to the store.

After his return at 10 p.m., Blanchard left to walk the dog for about twenty minutes. Linn stayed in the house drinking and preparing Blanchard's first drink. Upon his return, the two began drinking heavily. Linn made him several more drinks. By the end of the night, each had a blood alcohol level above 0.18. No indication that either had used drugs was found.

At 11:06 p.m., Blanchard called his friend Scott to say that he shot Linn, it was a big mess, and he needed Scott's truck. This was a practical joke. Scott heard Linn laugh in the background. Scott also heard Linn remark that she could not believe Scott would not come help his best friend Blanchard dispose of her body. Scott admonished Blanchard, telling Blanchard that it was wrong to call him like that. Scott recognized that Blanchard was drunk during the phone call.

Blanchard and Linn were talking in the living room. A good friend of Linn's called to borrow a drop cord. About seven to ten minutes later, the friend arrived to borrow the cord. Linn teased the friend by first offering a six-inch telephone cord, then gave him the drop cord. The friend left. Linn sat at her end of the couch holding the telephone cord.

Blanchard told Linn to stop swinging the telephone cord because it was bothering him. She responded by telling Blanchard that she did not like the heavy metal music that he was playing. She started asking him what he saw in the music and was subconsciously swinging the cord. "That's when the pleasantries seemed to dissipate." The fact that Blanchard may have been homeless the next day could have also aggravated the situation.

Irritated with her swinging the cord, Blanchard told her to "knock it the f*** off" and asked, "How many marks do you want in the morning, bitch?" He continued, "I'm going to leave you with marks, bitch. You

better stop swinging that, bitch." "[She] was upset for the tone of voice, for the -- for the threat, because at this point past the first part of [their] relationship [she] knew that he meant he was going to put marks on [her] body." Linn responded, "You're not going to sit there and tell me what to do in my own house . . . . I can swing it if I want to . . . ." He called her a bitch a couple more times, she replied by calling him a bitch, and he retorted, "You don't call me that." Linn was upset and felt that Blanchard was going to beat her. At trial, Linn testified, "[I]t was just . . . two drunks saying the same thing back and forth."

At that point, Blanchard hit Linn in the mouth. This was not long after the friend came for the drop cord. Linn receded to the bedroom.

Linn was sitting on her bed crying and scared. She did not want to call the police but wanted Blanchard out of the house. Blanchard was screaming at her from another part of the house. Among other things, he said, "You made me do it, you know what I'm capable of." He also repeated his refrain that he would rape her dead or alive.

At some point during the evening, Linn placed two calls to Scott. The trial transcript suggests the calls occurred at 11:48 p.m. One of the calls went to Scott's voicemail. Crees answered the other call. Crees testified she was uncertain about the time of the calls. In the call Crees answered, Linn stated in a "demanding" voice that Blanchard's friend Scott had to come get Blanchard. Crees asked Linn to put Blanchard on the phone. Linn responded that he would not get on the phone. Crees did not hear Blanchard say he would not get on the phone. Crees also testified, "[Linn] said that 'you know me, I won't call the' -- I don't know if she said 'cops' or 'call anybody, I'll take -- deal with it myself.' Something to that effect." Crees did not remember if there was anything more to the phone call or how it ended. Linn testified that those two phone calls occurred

before the shooting. Linn "was getting scared. [She] was scared." Linn said that the self-help she referred to in the call was from gang members or other people who had previously helped her remove men from her home. She preferred this to involving the police, she noted, because no one would be arrested for drugs or drug paraphernalia.

While Linn was seated on the bed, Blanchard abruptly entered the bedroom. He sat on the bed, they talked, then he got up and began removing his clothing "to [rape her] dead or alive." The situation was "spinning out of control" and both were screaming. Blanchard began strangling her and told Linn that he was going to have sex with her. She said, "No, you're not."

Around this time, one of the two of them removed a rifle from the closet. Someone took the gun out of its case and placed it on the bed where both were now seated. Both began touching and handling the rifle.

The two continued to scream and struggle with each other. Blanchard had one hand on Linn's throat choking her. This was not a consensual sexual act, and Linn had told him on prior occasions that this behavior was unacceptable. She explained, "He was hurting me. It wasn't the type of strangulation that we shared during intercourse. It was a more -- a different position of hands on my throat, a different feeling. I could not breathe." Linn was frightened and tried to remove his hands so she could breathe. She "felt that [she] was being choked to die, or to submit." She believed that Blanchard was going to kill or rape her, or both.

Both still had their hands on the rifle. Blanchard dared Linn to shoot him. He said, "Do it, do it, do it, do it." When asked on cross-examination whether the gun was pointed at Blanchard's chest, Linn acknowledged the photos would support that conclusion. The gun went off and one shot was fired. Linn did not know who, if anyone, had been

struck.  Linn looked and saw she had not been shot.  The next thing she knew, Blanchard was on the floor, and she realized he was the victim of the weapon's discharge.  The bullet struck Blanchard in the chest.  Blanchard's body had powder burns suggesting he was shot from close range.  Linn testified, "I just wanted him out, but I didn't intentionally kill him."

Linn called 911 at 12:02 a.m. on February 7.  She testified that she called 911 immediately after the shooting.  She was in shock.  She wanted someone to come save Blanchard.  She told the 911 operator that she shot Blanchard.  She testified that she told this to the operator "because [she] was not the one laying on the ground."

About a minute after her 911 call, police began arriving at her house.  Linn was still in shock and left the house screaming, "Help him, help him."  One police officer described Linn as "hysterical," while another stated that "[s]he was very upset, crying, and appeared to be extremely confused."  She was outside wearing a nightgown, and officers retrieved some boots and a coat for her.  Police entered the residence and found Blanchard's body in the bedroom.  The rifle and a gun case were on the bed.

While the officers investigated, Linn was outside on the porch.  An officer inside yelled out, "Is she saying she shot him?"  The question was posed to Linn, who answered, "Yes."  Linn further stated, "I only had one gun and one bullet, and I shot him because he was not being nice to me."  As one officer walked Linn to the squad car,

> she was ranting about the subject not hurting her again, making statements that he'd hurt her in the past and was going to hurt her tonight, and it was all over, and she'd asked . . . if he was dead and [the police officer] said that [he] believed he was.

On the drive to the police station, Linn asked the police officer driving her if Blanchard had died. The officer replied that he did not know. Linn also stated, "My life has ended up as [a] murder."

At the police station, Detective Lawrence interviewed Linn for approximately four hours. He employed the Reid technique[4] as modified by his prior experience and his observations of Linn. According to the opinion of the court of appeals, Linn asked during the interview, "Did I kill him?" and "Did he die?" The detective untruthfully told her that he did not know. The court of appeals also stated that during the interview, Linn admitted to threatening Blanchard with the rifle.[5]

Apparently Linn stated during the interview that she got the gun out of the closet and that she and Blanchard were playing around with the gun on the bed. At times, according to Detective Lawrence, Linn noted that she was not afraid of anyone and was not afraid of Blanchard. Also, according to the court of appeals, Linn stated that she told Blanchard no one was going to tell her what to do in her house. But she also averred that he was strangling her. Additionally, according to Detective Lawrence, "She also made mention during that interview that the reason why she knew she could have balls that big is because she knew that there was a gun back there that she [could] go get." There were some things Linn stated she did not know to which Detective Lawrence thought she had to

---

[4]The Reid technique is an interrogation method that seeks to deprive the person being interrogated of every psychological advantage and is "designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged." *Miranda v. Arizona*, 384 U.S. 436, 449–50, 86 S. Ct. 1602, 1615 (1966); *see State v. Pearson*, 804 N.W.2d 260, 267 n.2 (Iowa 2011) (discussing the Reid interrogation technique).

[5]The PCR record does not contain any record of the transcript of Linn's interrogation or of Linn's 911 call to the police. As a result, no member of this court is in a position to determine independently the accuracy or completeness of the description contained in the opinion of the court of appeals on direct review.

know the answer, such as who loaded the weapon. Throughout her testimony at trial, Linn repeatedly stated that she was drunk during the interview, did not remember the interview, and could not explain what was going through her mind when she made statements during the interview.

During the interview, Detective Lawrence sought to determine whether there was a history of domestic abuse. To do so, he asked Linn what she wears to bed at night and her sexual history with Blanchard. He did not determine anything from his questions because, in his view, there were a lot of inconsistencies.

The State charged Linn with first-degree murder. During her trial, Linn asserted the shooting was justified as self-defense. She also asserted the shooting was an accident. No BWS expert witness was called, and BWS was not raised as part of her defense.

After the trial, the jurors deliberated for about three-and-a-half hours. The jury found Linn guilty of first-degree murder. She was sentenced to life imprisonment. Her conviction was affirmed on appeal. *Linn v. State*, No. 07–1984, 2009 WL 605968, at *1 (Iowa Ct. App. Mar. 11, 2009).

## II.  Procedural Background.

In 2009, Linn applied pro se for postconviction relief. She asserted, among other claims, that her trial counsel was ineffective for not raising BWS in her trial or seeking to admit BWS evidence. She noted that she had asked the trial counsel to put BWS evidence into the trial. She also stated that an evaluation regarding BWS and her mental health was not attached to the postconviction application.

For six years after Linn's initial PCR application, no action was taken. The State never filed an answer. Meanwhile, a number of court-appointed attorneys were replaced.

In 2015, Linn filed an "application for authority to retain [an] expert on battered woman syndrome." She cited our opinion in *State v. Frei*, 831 N.W.2d 70, 74 (Iowa 2013), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016), contending that the decision supports her position that expert BWS testimony is relevant to a justification defense. Linn asserted,

> [I]n order to determine whether trial counsel was ineffective in failing to call an expert witness to testify regarding [BWS] and its relevancy to [her] justification defense, it is necessary for PCR counsel to retain an expert to review the reports and transcripts relevant to this issue, and to discuss said issue with PCR counsel and, if requested, to provide a report setting out the same.

She also stated that Lauri Schipper, a sociology professor at the University of Iowa, was willing to serve as her BWS expert and noted that we previously found Schipper to be a BWS expert in *State v. Griffin*, 564 N.W.2d 370, 374 (Iowa 1997). Finally, Linn contended that it was necessary and in the interests of justice to grant her request to retain the BWS expert at public expense because Linn was incarcerated, indigent, and could not reasonably afford to retain the expert. Thus, she requested approval to retain the professor and incur costs up to $2500.

On July 21, 2016, a few months after appointment of a new attorney, Linn amended her PCR application. She asserted that her trial counsel failed to perform an essential duty by not investigating BWS and not advising her on the wisdom of presenting BWS evidence, especially since Linn asked trial counsel to investigate BWS. Linn asserted that trial counsel's failure prejudiced her because important factors surrounding the circumstances of Blanchard's death were not presented to the jury. Consequently, she said, she was deprived of effective counsel guaranteed by the Sixth Amendment. *See* U.S. Const. amend. VI.

The next day, the State served interrogatories on Linn. The State asked Linn to identify the facts that would have supported the use of BWS as a defense strategy. The State also asked Linn to identify any BWS expert who would testify in the PCR proceeding. Linn responded on September 8 that her investigation was ongoing and she would supplement the response.

On September 19, the State filed a motion for summary disposition. The State argued there were no material facts in dispute, pointing to Linn's discovery responses. The State also contended that Linn would be unable to show that her attorney was ineffective because BWS would have been inconsistent with her theory at trial that the shooting was an accident and, therefore, the failure to present BWS was a strategic decision. Attached to the State's motion were the transcript of Linn's trial, the court of appeals 2009 decision affirming her conviction on direct appeal, and Linn's interrogatory responses.

On November 10, Linn again moved for a court-appointed expert. Noting that her claim involved technical medical expertise regarding BWS, she explained that neither she nor her attorney had the expertise required to evaluate the claim. She stated that she had found another BWS expert willing to provide the court "an objective written assessment" for $4000.

On December 1, Linn filed a resistance to the State's motion. She argued that a genuine issue of material fact still existed. She also contended that granting the State's motion would not afford her the opportunity to be heard on her claims. Linn attached her amended PCR application, but nothing else, to her resistance.

The State replied one day later, observing that Linn failed to present materials in support of her claim. The State also contended that because

she ultimately bears the burden of proof, she could not wait until the hearing to share her evidence.

One week later, the trial court granted the State's motion for summary disposition. The court said,

> Viewing the record in the light most favorable to the moving party the Court finds that the general statements in the Applicant's original and amended Application for Relief do not set forth specific facts showing any genuine issue of material facts. . . . She ha[s] not provided the Court with any affidavits or other materials which would tend to show the existence of a factual dispute.

The court then turned to specifically address Linn's claim regarding BWS, stating that

> Linn's claim that trial counsel was ineffective for failing to raise [BWS] fails. She provides no information as to what facts were available to her trial counsel to support such a claim. She provides no expert witness testimony by affidavit to explain how a jury might have been told that the syndrome was relevant. And, more importantly, the State of Iowa correctly notes that such syndrome evidence would have been inconsistent with her trial testimony about the nature of the shooting. Linn cannot demonstrate that her trial counsel's performance was deficient and there is no evidence of resulting prejudice.

In its decision, the court also denied Linn's motion to retain an expert at state expense. Thus, the district court must have been aware of the pending motion at the time of its decision.[6]

Linn appealed. She asserted the trial court erred in finding there was no information available to trial counsel to support BWS, granting summary disposition for want of an expert while simultaneously denying her request for court funds to retain an expert, and concluding summary disposition was warranted because BWS was inconsistent with her

---

[6]Notwithstanding the facts of this case, we believe that, in general, district court judges have the responsibility to be aware of pending motions or to ask the parties about pending motions before commencing a hearing or finally adjudicating a proceeding.

defense. She also asserted that her PCR counsel was ineffective in failing to set forth evidence to resist the State's motion for summary disposition.

The court of appeals affirmed the trial court's order. The court of appeals acknowledged that the evidence could both support and disprove a BWS-supported claim of self-defense. Given the countervailing evidence, the court of appeals found Linn's claim "unpersuasive." The court of appeals further stated Linn could not show she was prejudiced by her counsel's failure and she had not "created" a material issue of fact. In addition, the court of appeals stated that any error in refusing to appoint a BWS expert in the PCR proceeding was harmless because it would not have changed the result of Linn's jury trial. The court of appeals also rejected Linn's claim that her PCR counsel was ineffective.

Linn applied for further review. We granted the application.

### III. Applicable Legal Standards.

**A. Standards of Review.** We ordinarily review summary dispositions of PCR applications for correction of errors at law. *Moon v. State*, 911 N.W.2d 137, 142 (Iowa 2018); *Castro v. State*, 795 N.W.2d 789, 792 (Iowa 2011). However, our review is de novo when the basis for postconviction relief implicates a constitutional violation. *Moon*, 911 N.W.2d at 142; *Castro*, 795 N.W.2d at 792. PCR applications alleging ineffective assistance of counsel raise a constitutional claim. *Castro*, 795 N.W.2d at 792. We review decisions on appointment of an expert for abuse of discretion. *See State v. Dahl*, 874 N.W.2d 348, 352 (Iowa 2016).

**B. Standard for Summary Disposition.** The legislature provided for summary disposition of PCR proceedings in Iowa Code section 822.6. That provision states,

> The court may grant a motion by either party for summary disposition of the application, when it appears from the pleadings, depositions, answers to interrogatories, and

admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Id.* The goal of that provision "is to provide a method of disposition *once the case has been fully developed by both sides*, but before an actual trial." *Manning v. State*, 654 N.W.2d 555, 559 (Iowa 2002) (quoting *Hines v. State*, 288 N.W.2d 344, 346 (Iowa 1980)).

"We apply our summary judgment standards to summary disposition of postconviction-relief applications." *Moon*, 911 N.W.2d at 142. "[F]or a summary disposition to be proper, the State must be able to prevail as if it were filing a motion for summary judgment in a civil proceeding." *Schmidt v. State*, 909 N.W.2d 778, 784 (Iowa 2018).

A court examining the propriety of summary judgment must "view the entire record in the light most favorable to the nonmoving party." *Bass v. J.C. Penney Co.*, 880 N.W.2d 751, 755 (Iowa 2016). The court must also indulge on behalf of the nonmoving party every legitimate inference reasonably deduced from the record in an effort to ascertain the existence of a fact question. *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 20 (Iowa 2012); *Crippen v. City of Cedar Rapids*, 618 N.W.2d 562, 565 (Iowa 2000).

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3); *Banwart v. 50th Street Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018). "We examine the record to determine whether a material fact is in dispute . . . ." *Ranes v. Adams Labs., Inc.,* 778 N.W.2d 677, 685 (Iowa 2010). "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby

reach different conclusions." *Banwart*, 910 N.W.2d at 544–45 (quoting *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005)).

In ruling on a motion for summary judgment, the court does not weigh the evidence. *Clinkscales*, 697 N.W.2d at 841; *Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 300 (Iowa 1996). Instead, the court inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *Clinkscales*, 697 N.W.2d at 841; *Bitner*, 549 N.W.2d at 300. When the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, there is a genuine issue for trial. *Bitner*, 549 N.W.2d at 300. The burden of showing undisputed facts entitling the moving party to summary judgment rests with the moving party. *Castro*, 795 N.W.2d at 792.

**C. Standard for Ineffective Assistance of Counsel Under the Sixth Amendment.** Where, as here, a party seeks relief under a provision of the Federal Constitution, our analysis turns on that federal constitutional provision. *See State v. Prusha*, 874 N.W.2d 627, 630 (Iowa 2016). To succeed on a claim of ineffective assistance of counsel under the Sixth Amendment as applied to the states under the Fourteenth Amendment, a claimant must establish by a preponderance of the evidence that (1) trial counsel failed to perform an essential duty and (2) this failure resulted in prejudice. *See State v. Thorndike*, 860 N.W.2d 316, 319–20 & n.1 (Iowa 2015); *accord Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

"Under the first prong, 'we measure counsel's performance against the standard of a reasonably competent practitioner.'" *Thorndike*, 860 N.W.2d at 320 (quoting *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012)). We presume counsel acted competently, but that presumption is overcome if we determine the claimant has proved by a preponderance of the

evidence that counsel failed to perform an essential duty. *Id.* "We assess counsel's performance 'objectively by determining whether [it] was reasonable, under prevailing professional norms, considering all the circumstances.' " *Id.* (alteration in original) (quoting *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 & n.3).

"Under the second prong, the claimant must establish that prejudice resulted from counsel's failure to perform an essential duty." *Id.* "The claimant must show 'counsel's errors were so serious as to deprive [him or her] of a fair trial.' " *Id.* (alteration in original) (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). "[T]he effect must be affirmatively demonstrated by showing 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). "The likelihood of a different result need not be more probable than not, but it must be substantial, not just conceivable." *King v. State*, 797 N.W.2d 565, 572 (Iowa 2011). "The ultimate question is 'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " *Thorndike*, 860 N.W.2d at 320 (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068–69). We may find prejudice where, but for counsel's breach of an essential duty, there is a reasonable probability that the defendant would have been convicted of a lesser charge or sentenced to less prison time. *See Missouri v. Frye*, 566 U.S. 134, 147, 132 S. Ct. 1399, 1409 (2012).

**IV.  Overview of Battered Spouse Syndrome.**

**A.  Introduction.**  This case requires us to review the content and context of BWS.  The district court and the State evince fundamental misapprehensions about BWS.  Relying on those misapprehensions, the district court and the State misunderstand the facts in this case and misapply legal requirements.

The district court believed—in spite of a trial transcript with indications of Blanchard's verbal, psychological, and physical abuse toward Linn—"[s]he provides no information as to what facts were available to her trial counsel to support" her claim that BWS should have been raised at her trial.  Blanchard's physical abuse includes, at least, choking, hitting, "hurt[ing]," and more than a dozen instances of clotheslining.  That physical abuse is consistent with the type of abuse that causes BWS.  Elizabeth Dermody Leonard, *Convicted Survivors: The Imprisonment of Battered Women Who Kill* 29 (2002) [hereinafter Leonard] ("[T]ypical battering episodes involve slaps, punches, kicking, stomping, and choking.").

Blanchard's verbal and psychological abuse include threats to cut Linn up the length of her body and rape her while she was still bleeding, threats to "hurt [Linn] or any other individual . . . if [Blanchard] even think[s] [she is] with another individual," intimations that "nobody else [is] going to ever have you," warnings that she "better not f***ing piss him off" in light of his history of violence, and thefts of her property.  That pattern of abuse is also the type that causes BWS.  Leonard at 15–16 (explaining that forms of psychological abuse include threats to kill or harm a woman or her children, property destruction, verbal abuse, required secrecy, and fear arousal); Lenore E.A. Walker, *The Battered Woman Syndrome* 9, 21, 92 (4th ed. 2017) [hereinafter Walker] (explaining that batterers use

jealousy to justify further abuse and "in the psychological domain, the significant portion of battered women experienced being cursed at, humiliated, and having controlling partners").

Although Linn's claim does not only depend on psychological abuse, it is notable that courts and commentators explain that psychological abuse alone can cause BWS. *Nguyen v. State*, 520 S.E.2d 907, 908 (Ga. 1999) (holding that psychological abuse accompanied "by other acts or verbal statements giving rise to a reasonable fear of imminent physical harm" warrants introduction of BWS testimony); Walker at 9, 21, 92 (explaining that either psychological or physical abuse can independently cause BWS); Kent M. Williams, *Using Battered Woman Syndrome Evidence with a Self-Defense Strategy in Minnesota*, 10 L. & Ineq. 107, 110 (1992) [hereinafter Williams] ("[A] woman need not be physically injured by the batterer, although some sort of physical abuse usually accompanies the psychological harm inflicted." (Footnote omitted.)). An "emphasis on severe violence, injury, and traumatically induced dependence (or helplessness) would . . . miss[] the most important dimensions of [a battered person's] entrapment, the deprivation of liberty due to ongoing intimidation, isolation, and control." Evan Stark, *Re-Presenting Woman Battering: From Battered Woman Syndrome to Coercive Control*, 58 Alb. L. Rev. 973, 1005 (1995) [hereinafter Stark]. In different circumstances, we have noted that "scholars have opined the definition of 'force' should include psychological force" and "conclude[d] psychological force . . . may give rise to a conviction under the 'against the will' element of [sexual abuse in the third degree]." *State v. Meyers*, 799 N.W.2d 132, 145–46 (Iowa 2011).

Taking a different tack, the State argues that BWS testimony was unneeded in Linn's trial because the jury could consider the facts of

Blanchard's abuse without the testimony. Yet the most important role for BWS testimony is to contextualize such facts, U.S. Dep't of Justice & U.S. Dep't of Health & Human Servs., *The Validity and Use of Evidence Concerning Battering and Its Effects in Criminal Trials: Report Responding to Section 40507 of the Violence Against Women Act* vii (1996) [hereinafter DOJ Report], and we have previously held that trial courts properly admitted BWS testimony for such a purpose, *see State v. Rodriquez*, 636 N.W.2d 234, 245–46 (Iowa 2001); *Griffin*, 564 N.W.2d at 374–75.

Additionally, invoking what is perhaps the most common myth associated with battering victims—they can simply end the battering by leaving the relationship, *see State v. Ordway*, 619 A.2d 819, 827 (R.I. 1992); Leonard at 30—the State asks us to find that BWS testimony could not have changed the result of Linn's trial because she told Blanchard the relationship was over and allowed him to stay the night. "[S]tatistically, a battered woman is in the most danger when she tries to leave an abusive relationship." *Rodriquez*, 636 N.W.2d at 245 (noting testimony by Muscatine County expert).

Further, although the State concedes that "BWS evidence would likely have been admissible and potentially relevant to bolster a justification defense," the State tells us this was "*not* a BWS case" on the ground that Blanchard's death occurred while he was choking Linn and threatening her with rape, death, or both. Contrary to common assumptions, BWS victims are most likely to use lethal violence against a batterer during an attack in which they perceive a threat of immediate harm, Sanford H. Kadish et al., *Criminal Law and Its Processes: Cases and Materials* 855 (9th ed. 2012) [hereinafter Kadish]; Leonard at 25, and in any case, "expert testimony can aid in cautioning jurors that the behavior of battered women should not be lightly dismissed as inherently

unreasonable," *Frei*, 831 N.W.2d at 75. By ignoring the abundant literature showing that BWS victims do not fit a stereotype, Leonard at 4; Brenda L. Russell, *Battered Woman Syndrome as a Legal Defense: History, Effectiveness and Implications* 13–16, 74, 80–89, 96, 191, 203 (2010) [hereinafter Russell]; Walker at 12, 18, the State seems to "pretend to accept the legitimacy of a true battered woman's self-defense, as well as the accompanying expert testimony, but structure[s] [its] opposition to the defense by asserting that the woman in question 'does not fit the mold.' " Michael Dowd, *Dispelling the Myths About the "Battered Woman's Defense": Towards a New Understanding*, 19 Fordham Urb. L.J. 567, 581 (1992) [hereinafter Dowd].

As is evident, a proper understanding of BWS is essential to determine the merits of this case. Therefore, we consider whether summary disposition was properly granted after reviewing the literature and caselaw on BWS.

**B. History of Legal Treatment of Domestic Abuse.** The law's historical treatment of domestic abuse, and its response, is wretched. In the past, "[i]f a woman showed any signs of having a will of her own, the husband was expected by both church and state to chastise her for transgressions." U.S. Comm'n on Civil Rights, *Under the Rule of Thumb: Battered Women and the Administration of Justice* 1 (1982) [hereinafter U.S. Comm'n on Civil Rights]. Hammurabi's Code permitted a husband to inflict punishment on his wife for any transgression. Russell at 29. Roman law permitted a husband to discipline his wife by blackening her eyes or breaking her nose. Dowd, 19 Fordham Urb. L.J. at 568. In many parts of Europe, a man could kill his wife without legal punishment well into the 1600s. *Id.*

British common law allowed wife beating but, in an act of "compassion," limited the husband to a "rod not thicker than his thumb." Leonard at 13. Additionally, under the common law in Britain, a man who killed his wife was charged with homicide, while a woman who killed her husband was charged with treason punishable by burning at the stake because her act of homicide was considered analogous to murdering the king. *Id.*; Dowd, 19 Fordham Urb. L.J. at 568.

Early American law was hardly any better, generally following the British tradition of allowing a husband to discipline his wife. Leonard at 13; Russell at 30; *see, e.g., Bradley v. State*, 1 Miss. 156, 158 (1824) (allowing a husband to inflict "moderate chastisement" and "salutary restraints" because "vexatious prosecutions" would "result[] in the mutual discredit and shame of all parties concerned"); *State v. Black*, 60 N.C. 262, 267 (1864) (stating that "the law will not invade the domestic forum or go behind the curtain" unless there is an excess of violence). The "Pilgrims of Plymouth Colony in Massachusetts actually enacted the first laws in the world that denounced domestic violence and made battering illegal," but these laws were symbolic—between the years 1633 and 1802 only twelve cases of domestic violence were brought to the courts while religious beliefs permitted moderate forms of battering. Russell at 29.

The legal permission for a husband to beat his wife began to disappear in the latter part of the nineteenth century. U.S. Comm'n on Civil Rights at 2. But until the 1980s, the law generally continued to turn a blind eye. *Id.* at ii; Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2118 (1996) [hereinafter Siegel]. "[M]any police departments had rules expressly discouraging officers from making an arrest in response to a domestic violence complaint. The battered woman's perception that legal authorities offered

no recourse often was well grounded in fact." Kadish at 838. And when women fought back and killed their abusers, they "encountered a system of justice that prosecuted them with a . . . quickness and efficiency never provided when the circumstances were reversed." Dowd, 19 Fordham Urb. L.J. at 570. The society that tolerated wife beating did not tolerate a woman fighting back. *Id.*

American policing and prosecution of domestic abuse began to change in the 1970s. Russell at 31–32; *see also State v. Cashen*, 789 N.W.2d 400, 416 (Iowa 2010) (Cady, J., dissenting) ("While domestic abuse was rarely prosecuted as a crime in the not-too-distant past, it is now a common subject of civil and criminal enforcement in this state and nationwide."). Authorities are still figuring out the appropriate way to deal with domestic violence. Kadish at 838–40; Leonard at 18; Siegel at 2119.

But the problem has not gone away. "[T]he historical legacy of the legalized injustices of pre-modern times documents a societal ideology that is not easily erased. In spite of more recent liberations, violence has persisted." Russell at 30. "In the United States, women are more likely to be attacked, injured, raped, or killed by a current or former male partner than by all other types of assailants combined." Leonard at 3. "Between 1976 and 1996, intimates murdered 6 out of every 100 male victims and 30 out of every 100 female victims." *Id.* at 8.

> "The average prison sentence of men who kill their women partners is 2 to 6 years. Women who kill their male partners are sentenced on average to 15 years, despite the fact that most women who kill do so in self-defense."

*Fact Sheet on Battered Women in Prison*, Purple Berets (last modified Mar. 19, 2003), http://www.purpleberets.org/pdf/bat_women_prison.pdf.

The situation in Iowa is similar and in some respects worse. "Domestic abuse against women is a serious problem in Iowa and the

nation as a whole." *In re J.P.*, 574 N.W.2d 340, 344 (Iowa 1998). "In Iowa, statistics show that from 1990 to 1993, domestic abuse civil filings rose from 188 to 2677." *Cashen*, 789 N.W.2d at 416 n.6. In 2010, among the 24,000 reports of domestic abuse in Iowa, approximately eighty percent to eighty-five percent were crimes against women. Ashley D. Brosius, Note, *An Iowa Law in Need of* Imminent *Change: Redefining the Temporal Proximity of Force to Account for Victims of Intimate Partner Violence Who Kill in Non-Confrontational Self-Defense*, 100 Iowa L. Rev. 775, 784 (2015). That same year, abuse victims in Iowa made approximately 72,000 crisis calls and spent almost 100,000 nights in a domestic violence shelter. *Id.* at 785. Funding cuts have resulted in the closure of eleven victim service programs in Iowa. *Id.* "Iowa has one of the lowest funding rates for victim services nationwide." *Id.* at 786.

**C. Who Are BWS Victims?** In the 1970s, battered women who defended themselves against their husbands' violence began to assert that their actions were justified. Cynthia K. Gillespie, *Justifiable Homicide: Battered Women, Self-Defense, and the Law* 9–10 (1989) [hereinafter Gillespie]. "That women killed their husbands was not new; that they argued they had a right to do so definitely was." *Id.* at 10.

The BWS theory became part of our collective discourse with the 1979 publication of Dr. Lenore Walker's *The Battered Woman. See* Walker at 5. Dr. Walker conceived "battered woman syndrome" as

> the pattern of the signs and symptoms that have been found to occur after a woman has been physically, sexually, and/or psychologically abused in an intimate relationship, when the partner (usually, but not always, a man) exerted power and control over the woman to coerce her into doing whatever he wanted, without regard for her rights or feelings.

*Id.* at 49–50. Walker predicted a recurring cycle of three phases to BWS. These are (1) tension building accompanied with rising sense of danger,

(2) an acute battering incident, and (3) loving contrition. *See id.* at 94. Walker stated that the loving contrition phase would engender "learned helplessness" and lead a battered woman to stay in the relationship. *See id.* (emphasis added). Walker stated in 1979 that a woman had to go through the cycle twice before being classified as a battered woman. Russell at 93.

In response to Walker's work, many researchers urged caution in adopting a single notion of a BWS victim. *See, e.g.*, id. at 19; Phyllis L. Crocker, *The Meaning of Equality for Battered Women Who Kill Men in Self-Defense*, 8 Harv. Women's L.J. 121, 137 (1985) [hereinafter Crocker]; Dowd, 19 Fordham Urb. L.J. at 581; Brenda L. Russell & Linda S. Melillo, *Attitudes Toward Battered Women Who Kill: Defendant Typicality and Judgments of Culpability*, 33 Crim. Just. & Behav. 219, 219 (2006) [hereinafter Russell & Melillo]. They generally warned that "the syndrome would lead to a stereotype all battered women would be expected to fit," that battered victims with characteristics and experiences considered atypical may be disbelieved because of that atypicality, and that "jurors may judge them more harshly if they do not fit their perceptions of what a battered woman should be." Russell at 7.

Later scholarship has confirmed the foresight of those warnings. In one study, people were less likely to find a woman guilty whose characteristics coincided with those of their preconceived notion of a battered woman: bruised, small in stature, thin or overweight, fragile, weary, fearful, poor, and appeasing. Russell & Melillo, 33 Crim. Just. & Behav. at 219, 225–26. Another study "found that the further the defendant moved away from jurors' beliefs about what a battered woman should be, the harsher their verdicts became." Russell at 56.

BWS victims do not fit a stereotype. Woman battering crosses all racial, ethnic, religious, socioeconomic, educational, and age groups. Leonard at 4; Russell at 13, 74, 80–89, 191. A large number of BWS victims are "intelligent, well-educated, competent people, some of whom also h[o]ld responsible jobs" and "appear[] to be just like other people, when the batterers' possessiveness and need for control [a]re contained." Walker at 12, 18. Some are passive and financially dependent, Russell at 13, while some fight back, *id.* at 96. Battering afflicts women in both urban and rural communities. Wendy Boka, Note, *Domestic Violence in Farming Communities: Overcoming the Unique Problems Posed by the Rural Setting*, 9 Drake J. Agric. L. 389, 413 (2004). A Victorian distinction between "respectable women" and "rough women" is inapposite because both can suffer BWS. *See* Stark, 58 Alb. L. Rev. at 1019.

Further, Walker's prediction that all BWS victims encounter a similar cycle of violence has not stood the test of time. Empirical research has found that "only 65% of the cases involved a tension-building stage prior to the battering, and in only 58% of the cases did a period of loving contrition follow the battering incident." Regina A. Schuller & Neil Vidmar, *Battered Woman Syndrome Evidence in the Courtroom: A Review of the Literature*, 16 L. & Hum. Behav. 273, 280 (1992) [hereinafter Schuller & Vidmar]. As numerous commentators have observed, Walker's prediction about the cycle of violence was based on a "lack of control groups, problems with interviewing methods and data analysis, and absence of data supporting some of her conclusions." Jane K. Stoever, *Transforming Domestic Violence Representation*, 101 Ky. L.J. 483, 508 (2012) (footnotes omitted). The prediction "suggests there is one set of effects of battering; promotes an image of battered women as 'helpless, meek, and unreliable agents'; and discounts the experiences of those who do not fit into the

model." *Id.* (footnotes omitted). Some prosecutors recognize the deficiencies in the cycle of violence theory and the presence of alternative explanations:

> The parameters and definition of Battered Woman Syndrome (BWS) have evolved since Lenore Walker's initial definition. Particularly significant to the evolution of knowledge about battered women is the acknowledgement that each battered woman's experience is different. As a result, it is understood that not all battered women experience a cycle of violence. Similarly, it is also recognized that the cycle of violence is only one of several theories regarding the dynamics of domestic violence. For example, the theories of "power and control" and "a continuum of violence" are both accepted as alternative descriptions of domestic violence dynamics. The theory of power and control describes the physical, psychological, emotional and financial ways in which a batterer controls his partner in a domestic violence relationship. The theory of a continuum of violence describes intimate partner violence that is constant and is expressed as verbal abuse to low level violence through serious assaults or possibly homicide, throughout the course of the relationship.

Jennifer Gentile Long & Dawn Doran Wilsey, *Understanding Battered Woman Syndrome and Its Application to the Duress Defense*, 40-APR Prosecutor 36, 37 (2006).

Walker's cycle of violence theory is also based on, and fosters, a classical and wrong view of women as lacking capacity to make rational decisions. The theory disregards, as further discussed below, the escalation in violence faced by BWS victims who try to leave their abuser, *see Rodriquez*, 636 N.W.2d at 245, and the rational choice that women make to stay in the relationship because of the danger in leaving or economic, social, and other costs, Russell at 81; Alafair S. Burke, *Rational Actors, Self-Defense, and Duress: Making Sense, Not Syndromes, Out of the Battered Woman*, 81 N.C. L. Rev. 211, 266 (2002) [hereinafter Burke]. Moreover, the notion that BWS victims will hew to a pattern of reconciliation and further abuse ignores that many BWS victims leave the

relationship after repeated failed attempts. Russell at 80–81. Reliance on Walker's cycle of violence theory can lead courts astray by, for example, taking away a woman's custody of her children under the view that the woman would necessarily continue to reconcile with her abusive husband and thereby endanger her children. *In re Betty J.W.*, 371 S.E.2d 326, 331–33 (W. Va. 1988) (reversing trial court determination that BWS victim could not be trusted to protect children); *see* Rebecca D. Cornia, *Current Use of Battered Woman Syndrome: Institutionalization of Negative Stereotypes About Women*, 8 UCLA Women's L.J. 99, 111–17 (1997) (examining similar cases).

Further noteworthy in regard to Walker's cycle of violence theory is that BWS can arise in both short-term and long-term intimate relationships. "[W]omen who have experienced mistreatment during a short period can suffer psychological consequences as serious as those who have suffered in this situation for years." Diva Estela Jaramillo et al., *Measurement of Psychological Distress in Battered Women*, 37 Colombia Medica 133, 135 (2006) (translated). Roughly forty percent of individuals who experience intimate partner abuse are victimized "over a relatively short time period." Evan Stark, *Coercive Control: How Men Entrap Women in Personal Life* 52 (2007) [hereinafter Stark, *Coercive Control*]. It is difficult to speculate, based solely on the duration of the relationship, what effect such abuse had on an individual. Leslie A. Sackett & Daniel G. Saunders, *The Impact of Different Forms of Psychological Abuse on Battered Women*, *in Perspectives on Viral and Psychological Abuse* 132 (Roland D. Maiuro, ed. 1999) [hereinafter Sackett & Saunders]. It is plausible that those suffering the most severe abuse ultimately have shorter relationships due to the intensity of the abuse. *Id.* Even when incidents of abuse are infrequent, the mere presence of abuse can render the victim in a "state of

siege," wherein they are in constant fear of an abusive incident arising. Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 Hofstra L. Rev. 1191, 1208 (1993) [hereinafter Dutton].

Courts have recognized that relationship duration or battering frequency are not good yardsticks to determine whether evidence on battering and its effects should be admissible. In *People v. Brown*, 94 P.3d 574, 575 (Cal. 2004), a woman suffered only one incident of abuse. The court considered whether expert testimony on the behavior of domestic violence victims is admissible in such circumstances. *Id.* The expert had been allowed to testify at trial concerning the tendency of domestic violence victims to later recant their description of violence. *Id.* at 577. The court held the testimony admissible without reaching the question of whether the testimony was admissible as evidence of BWS. *Id.* at 575; *cf. State v. Riker*, 869 P.2d 43, 50 (Wash. 1994) (en banc) (finding the defendant did not have a sufficient basis to raise BWS where she and the victim "were passing acquaintances whose limited contacts occurred mainly by telephone and over only a brief period of time").

Of course, physical violence is often part of the battering relationship. The physical violence primarily involves "hands, fists, and feet, and . . . typical battering episodes involve slaps, punches, kicking, stomping, and choking." Leonard at 29; *see also* Stark, 58 Alb. L. Rev. at 985–86 ("Much of the assaultive behavior in battering relationships involves slapping, shoving, hair-pulling, and other acts which are unlikely to prompt serious medical or police concern."). "Many batterers rape their female partners . . . ." Leonard at 15.

But it is not just physical violence that can give rise to BWS. Many courts have listed psychological abuse as a type of abuse that causes BWS.

*See, e.g., Bonner v. State*, 740 So. 2d 439, 441 (Ala. Crim. App. 1998); *State v. Robinson*, 718 N.W.2d 400, 407 (Minn. 2006); *State v. Townsend*, 897 A.2d 316, 327 (N.J. 2006); *Commonwealth v. Stonehouse*, 555 A.2d 772, 783 (Pa. 1989). Forms of psychological abuse include threats to kill or harm a woman or her children, verbal abuse, required secrecy, and fear arousal. Leonard at 15–16. "Uncontrollable jealousy by the batterer was reported by almost all of the battered women," "often to justify further abuse." Walker at 21, 92. "It is clear that in the psychological domain, the significant portion of battered women experienced being cursed at, humiliated, and having controlling partners." *Id.* at 92.

The effects of psychological abuse are dramatic. "[P]sychological abuse appears to have as great an impact as physical abuse" in intimate relationships. K. Daniel O'Leary, *Psychological Abuse: A Variable Deserving Critical Attention in Domestic Violence, in Perspectives on Verbal and Psychological Abuse* 23 (Roland D. Maiuro, ed. 1999) [hereinafter O'Leary]. "[P]sychological abuse is an essential component of men's control and domination of their female partners." Leonard at 15. "Repeatedly, even women who have been severely injured by husbands describe the psychological, mental, and emotional abuse as more damaging and difficult to overcome than the physical trauma." *Id.* The Centers for Disease Control (CDC) explains that "psychological aggression is an essential component of intimate partner violence" and that its impact "is every bit as significant as that of physical violence by an intimate partner." Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control, *Intimate Partner Violence Surveillance: Uniform Definitions and Recommended Data Elements* 15 (2015) [hereinafter CDC]. In different circumstances, we have noted that "scholars have opined the definition of 'force' should include psychological force" and "conclude[d] psychological

force . . . may give rise to a conviction under the 'against the will' element of [sexual abuse in the third degree]." *Meyers*, 799 N.W.2d at 145–46.

Psychological abuse can cause BWS even in the absence of physical violence. Research shows that "psychological control methods are separate but an important part of domestic violence," and can give rise to coercion "whether or not physical and sexual abuse are actually present." Walker at 9–10. "[A] woman need not be physically injured by the batterer, although some sort of physical abuse usually accompanies the psychological harm inflicted." Williams, 10 L. & Ineq. at 110 (footnote omitted). The abuse giving rise to BWS can take psychological, sexual, or physical forms and often includes multiple dimensions. Dutton, 21 Hofstra L. Rev. at 1204. One study revealed that "psychological abuse had a much stronger impact than physical abuse on fear. Ridiculing traits, criticizing behavior, and jealousy/control had the strongest relationship to fear." Sackett & Saunders at 132. Another study indicates that psychological abuse is a stronger predictor for posttraumatic stress disorder (PTSD) than physical abuse. Denise Hien & Lesia Ruglass, *Interpersonal Partner Violence and Women in the United States: An Overview of Prevalence Rates, Psychiatric Correlates and Consequences and Barriers to Help-Seeking*, 32 Int'l J.L. & Psychiatry 48 (2012); *see also Witt v. State*, 892 P.2d 132, 137 (Wyo. 1995) (noting BWS is a subset of PTSD); Williams, 10 L. & Ineq. at 110 (same).

Indeed, commentators suggest a focus on a batterer's pattern of coercion and control rather than his violent acts.

> Work with battered women outside the medical complex suggests that *physical violence may not be the most significant factor about most battering relationships.* In all probability, the clinical profile revealed by battered women reflects the fact that they have been subjected to an *ongoing* strategy of intimidation, isolation, and control that extends to all areas of

> a woman's life, including sexuality . . . . Sporadic, even severe, violence makes this strategy of control effective. But the unique profile of "the battered woman" arises as much from the deprivation of liberty implied by coercion and control as it does from violence-induced trauma.

Stark, 58 Alb. L. Rev. at 986 (footnote omitted). An "emphasis on severe violence, injury, and traumatically induced dependence (or helplessness) would . . . miss[] the most important dimensions of [a battered person's] entrapment, the deprivation of liberty due to ongoing intimidation, isolation, and control." *Id.* at 1005. "Battering arises out of a struggle for power in the home—'the *batterer's quest for control* of the woman.' " Dorothy E. Roberts, *Motherhood and Crime*, 79 Iowa L. Rev. 95, 114 (1993).

The Supreme Court of Georgia has expressly held that psychological abuse can warrant admission of expert BWS evidence even in the absence of physical abuse. *Nguyen*, 520 S.E.2d at 908. "Psychological abuse which humiliates, embarrasses or abases an individual is deplorable," the court said, and justifies admission of BWS testimony where accompanied "by other acts or verbal statements giving rise to a reasonable fear of imminent physical harm." *Id.*

Unfortunately, however, the legal system often downplays or neglects psychological abuse. O'Leary at 23; Walker at 529. This is possibly because "[p]sychological . . . abuse . . . is not usually treated as a criminal offense, and greater evidentiary problems are presented in . . . proving psychological abuse." U.S. Comm'n on Civil Rights at v.

In short, BWS cannot be neatly characterized as a product of physical violence by males against female partners according to a certain pattern.[7] Rather, BWS is a complex phenomenon.

---

[7]Courts have allowed expert testimony on the effects of battering in myriad circumstances. *See, e.g., State v. MacLennan*, 702 N.W.2d 219, 234 (Minn. 2005) (holding admissible expert testimony on characteristics and probable responses of a battered male child); *People v. Colberg*, 701 N.Y.S.2d 608, 610 (Cty. Ct. 1999) (allowing male defendant

**D. The BWS Victim's Response.** At the outset, it is important to recognize that battered women experience different psychological effects of abuse and each woman responds differently depending on her situation. Russell at 97; Regina A. Schuller, *Expert Evidence and Its Impact on Jurors' Decisions in Homicide Trials Involving Battered Women*, 10 Duke J. Gender L. & Pol'y 225, 234 (2003) [hereinafter Schuller]. BWS victims' responses include emotional reactions like fear, anger, and sadness; attitudinal changes like self-blame and distrust; symptoms of psychological distress such as depression and sleep problems; and actions like fighting back, initiating violence, escaping, avoiding the batterer, and protecting themselves and others from violence. Russell at 96–97, 115; Schuller, 10 Duke J. Gender L. & Pol'y at 234.

---

to use BWS evidence in prosecution for murder of his adult son). Further, while battering of women by their male partners occurs more often than any other type of family violence, *see* U.S. Comm'n on Civil Rights at ix–v; Leonard at 39, battered persons may identify as women, men, gay, lesbian, bisexual, and transgender, *see* Russell at 9, 13–16, 203; Ryiah Lilith, *Reconsidering the Abuse that Dare Not Speak Its Name: A Criticism of Recent Legal Scholarship Regarding Same-Gender Domestic Violence*, 7 Mich. J. Gender & L. 181, 218–19 (2001). Partly in response, it seems, a host of varied phrases has developed to reflect the different victims, aggressors, and behavior patterns involved, including "intimate partner violence," "battered spouse syndrome," and "battered person syndrome." *See Werner v. State*, 711 S.W.2d 639, 649 (Tex. Crim. App. 1986) (en banc) (Teague, J., dissenting) (collecting nomenclature)); Russell at 6, 128–29 (same). Advocates also recommend dropping the term "syndrome" because it may encourage reference to a stereotype or list of symptoms and can lead to the inaccurate perception that a sufferer is mentally unstable which runs counter to, among other things, properly using the evidence to prove that the sufferer acted reasonably in self-defense. DOJ Report at vii, xii–xiii; Russell at 7, 23–26, 137; Dowd, 19 Fordham Urb. L.J. at 577–78. Many of these advocates suggest the term "battering and its effects" is preferable because it does not carry those connotations. DOJ Report at vii, xii–xiii; Russell at 7, 23–26, 137. We agree with the Supreme Court of Louisiana that BWS may be "an inartful (and likely outdated) term." *State v. Curley*, 250 So. 3d 236, 244–45 (La. 2018). *But cf.* Gena Rachel Hatcher, Note, *The Gendered Nature of the Battered Woman Syndrome: Why Gender Neutrality Does Not Mean Equality*, 59 N.Y.U. Ann. Surv. Am. L. 21, 23–24 (2003) (arguing for continued usage of BWS because the term provides for a focus on sexist stereotypes and the different experiences faced by battered women). We use here the term "battered woman syndrome," or BWS, because it is the term used by the parties.

Many BWS victims experience psychological distress when exposed to stimuli associated with the battering, memory loss, and depression. Russell at 101, 112–13. Those symptoms are consistent with the symptoms of PTSD. *Id.* at 101, 112–13; *see also Witt*, 892 P.2d at 137 (noting BWS is a subset of PTSD under state law). One study found eighty-four percent of seventy-seven battered women in a battered woman's shelter met the clinical criteria for PTSD. Russell at 101.

Often, persons in battering relationships are "hypervigilant to cues of impending danger and accurately perceive the seriousness of the situation before another person who had not been repeatedly abused might recognize the danger." Lenore E.A. Walker, *Battered Women Syndrome and Self-Defense*, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321, 324 (1992). "Remarks or gestures that may seem harmless to the average observer might be reasonably understood to presage imminent and severe violence when viewed against the backdrop of the batterer's particular pattern of violence." *United States v. Nwoye*, 824 F.3d 1129, 1137 (D.C. Cir. 2016).

BWS victims' attunement to circumstances portending violence can cause them to act when others might not. They may react to a batterer's conduct "by initiating violence to protect themselves from what they perceive to be imminent danger." Russell at 218. Battering

> creates a hypervigilance on the part of the defendant and attunes the defendant to recognize a threat of imminent danger from conduct that would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence. It is the psychological response to that cycle of violence that helps explain why the defendant perceived a threat from objectively non-threatening conduct on the part of the victim and why, though *apparently* the aggressor, the defendant was actually responding to perceived aggression by the victim.

*State v. Smullen*, 844 A.2d 429, 451 (Md. 2004).

In responding to a perceived threat, BWS victims sometimes "use force that might seem excessive to nonbattered women in order to protect themselves or their children." Walker at 12. But ordinarily, BWS victims only "reach for a gun (or, sometimes it is placed in their hands by the batterer) because they cannot be certain that any lesser action will really protect themselves from being killed by the batterer." *Id.* at 18. "For women to kill, they generally must see their situation as life-threatening, as affecting the physical or emotional well-being of themselves or their children." Leonard at 25. "Where torture appears interminable and escape impossible, the belief that only the death of the batterer can provide relief may be reasonable in the mind of a person of ordinary firmness." *Robinson v. State,* 417 S.E.2d 88, 91 (S.C. 1992).

There are certain circumstances that tend to distinguish BWS victims who kill their batterer. "Frequently, a woman's lethal action is provoked by a sudden change in the pattern of violence, which signals to her that her death is imminent." Leonard at 26. Risk factors for a BWS victim's use of lethal action against a batterer include a man's threats to kill, his frequency of intoxication, forced sexual acts, and weapons in the home. *Id.* at 25–26. Further,

> [b]atterers most likely to be killed were the ones who continued to verbally degrade and humiliate a woman while she had the weapon in her hands. . . . So were those men who ordered the woman to kill them—using her, perhaps, to commit their own suicides.

Lenore E. Walker, *Terrifying Love: Why Battered Women Kill and How Society Responds* 104 (1989).

Further, a BWS victim may be stymied or dissuaded from leaving the relationship because of the retaliatory escalation in violence faced by those who leave, or try to leave, their abusers. "[S]tatistically, a battered

woman is in the most danger when she tries to leave an abusive relationship." *Rodriquez*, 636 N.W.2d at 245 (noting testimony by Muscatine County expert). Studies suggest battering victims are more likely to be killed or attacked by their batterers after separating from them. *Nwoye*, 824 F.3d at 1138; Leonard at 8; Russell at 111. Many BWS victims try to stay in the relationship because leaving may impose physical, emotional, economic, familial, and cultural costs. *See* Russell at 81. "In light of individual factual circumstances that vary from woman to woman," a BWS victim may make a "reasoned decision" to stay "based upon an evaluation of her viable escape options and the value she assigns to competing priorities." Burke, 81 N.C. L. Rev. at 266.

Walker postulated that BWS victims would exhibit "learned helplessness" in response to battering. According to Walker, learned helplessness is not meant to imply that a BWS victim is helpless, but rather that a BWS victim loses the ability to predict whether actions will lead to a particular outcome. Walker at 75. Walker suggested that learned helplessness explains why BWS victims do not leave the relationship. *Id.* at 76.

Walker's learned helplessness theory has come under withering criticism. "Experts in the field have largely abandoned the theory of learned helplessness and its conception of women who experience violence as passive non-actors." Leigh Goodmark, *Reframing Domestic Violence Law and Policy: An Anti-Essentialist Proposal*, 31 Wash. U. J.L. & Pol'y 39, 44 (2009), *accord* Sarah Gibbs Leivick, *Use of Battered Woman Syndrome to Defend the Abused and Prosecute the Abuser*, 6 Geo. J. Gender & L. 391, 393–94 (2005).

Commentators raise a number of problems with Walker's learned helplessness theory. First, approximately half to two-thirds of abused

women ultimately leave their abusers after repeated failed attempts. *See* Russell at 80–81.

Second, "not all battered women experienced the same psychological effects of abuse and . . . each woman responds differently depending on her situation." *Id.* at 97. BWS victims' responses include fighting back, initiating violence, escaping, avoiding the batterer, and protecting themselves and others from violence. *Id.* at 96–97, 115. Additionally, as noted, many battering victims choose to stay in a relationship, temporarily or indefinitely, for rational reasons such as the emotional, economic, familial, and cultural costs of leaving. *Id.* at 81. "A woman's participation in an abusive relationship can be understood without depicting domestic violence victims as homogenous, irrational, and cognitively impaired." Burke, 81 N.C. L. Rev. at 266. Further,

> [t]he medical, psychiatric, and behavioral problems presented by battered women arise because male strategies of coercion, isolation, and control converge with discriminatory structures and institutional practices to make it difficult, sometimes impossible, for women to escape from abusive relationships when they most want to or need to.

Leonard at 46. "[T]he difficulty women have in freeing themselves from violent relationships has more to do with 'the intransigence of their husbands' penchant for domination and the lack of support from traditional institutions,' than 'the woman's passivity or helplessness." Schuller, 10 Duke J. Gender L. & Pol'y at 234. Yet the terminology of learned helplessness wrongly evokes a woman's passivity and creates a stereotype of the BWS victim. Russell at 137.

**E. Myths, Misconceptions, and Assumptions Affecting Trials Involving BWS Victims.** A number of myths and misconceptions about BWS victims affect our criminal justice system. Some affect jurors. *See People v. Wilson*, 487 N.W.2d 822, 824 (Mich. Ct. App. 1992); *State v.*

*Hennum*, 441 N.W.2d 793, 798 (Minn. 1989); *Townsend*, 897 A.2d at 327; *Ordway*, 619 A.2d at 827. Myths and misconceptions affecting jurors include "(1) a belief that battered women can and should leave their abusers; [and] (2) a belief that if the woman on trial does not fit the person's stereotype of a battered woman, she is not a 'real battered woman.'" Leonard at 30.

Empirical research has shown that jurors harbor such myths and misconceptions. A survey of jurors awaiting jury duty found that,

> compared to the experts, the laypersons were less likely to believe that a battered woman would be persuaded to remain in the relationship by an abuser's promises to reform, that she would believe that using deadly force was the only way for her to protect herself, and that she would believe that her husband could kill her. Compared to the experts, the jurors were also more likely to indicate that battered women are probably abused because they are emotionally disturbed or masochistic.

Schuller & Vidmar, 16 L. & Hum. Behav. at 282–83. Such studies "suggest[] that lay knowledge regarding wife abuse may be contextually bound to the degree of similarity to the 'prototypical' battering relationship." Russell at 191.

The attorneys in a trial involving a BWS victim are not immune from harboring or invoking misapprehensions. Defense attorneys often do not understand the psychological response to chronic violence or the methods to introduce a defendant's life experiences into evidence. Leonard at 30. When a BWS victim presents evidence of a record of past abuse, "prosecutors turn it into a motive for the woman's crime of revenge—she is hysterical and out-of-control or she is cold-blooded and calculating." Leonard at 31, *accord* Gillespie at 24–25; Russell at 21–22. "[A] prosecutor who has benighted notions about women—or is willing to pander to the

worst possible prejudices of the jurors—can cause great injustice . . . ." Gillespie at 19.

Indeed, misconceptions about BWS victims can affect all legal actors. Stereotypes of BWS victims "can affect legal decision making, particularly when the defendant does not fit into [stereotypical] general beliefs." Russell at 16.

> Some courts seem to treat battered woman syndrome as a standard to which all battered women must conform rather than as evidence that illuminates the defendant's behavior and perceptions. . . . Unless she fits this rigidly-defined and narrowly-applied definition, she is prevented from benefiting from battered woman syndrome testimony.

Crocker, 8 Harv. Women's L.J. at 144.

Also, the law on self-defense imposes numerous hurdles to a BWS victim. "Current laws of self-defense are based largely on assumptions that apply best to situations of adult males fighting adult males and often do not reflect the reality most battered women experience." Leonard at 32. A battered woman "is generally not on equal physical grounds with the batterer," so "her actions cannot be the same as a fight between 'two equals.'" Schuller & Vidmar, 16 L. & Hum. Behav. at 276; *accord* Gillespie at 7. In addition, the violence faced by a BWS victim is continual and at the hands of an intimate partner, a context scholars assert is necessary when a jury weighs the imminence requirement in self-defense cases. Gillespie at 7–8; Schuller & Vidmar, 16 L. & Hum. Behav. at 276.

> Battered women in particular may perceive danger and imminence differently from men. Because they become attuned to stages of violence from their husbands, they may interpret certain conduct to indicate an imminent attack or a more severe attack. A subtle gesture or a new method of abuse, insignificant to another person, may create a reasonable fear in a battered woman.

Crocker, 8 Harv. Women's L.J. at 127 (footnote omitted). Consequently, scholars explain, a BWS victim may reasonably and honestly use a deadly weapon in self-defense to ward off an unarmed attacker. Russell at 117; Schuller & Vidmar, 16 L. & Hum. Behav. at 276. *But cf. State v. Nunn*, 356 N.W.2d 601, 604 (Iowa Ct. App. 1984) (finding sufficient evidence of no justification because "the argument had ended several minutes before the stabbing" and "the victim was not armed at the time"), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25–26 (Iowa 2001).

Researchers have discovered that jurors also harbor misconceptions when a BWS victim asserts self-defense. One study found that "when the defendant was portrayed as passive, mock jurors were more likely to believe that the defendant's belief of fear of imminent danger was more plausible." Russell at 192. "Beliefs such as these may make it difficult for jurors to understand how a woman might have a perception of imminent fear" or to understand why she did not simply leave the relationship. Schuller & Vidmar, 16 L. & Hum. Behav. at 276. Jurors "may ask: Why didn't she leave? Why didn't she call for help? Why did she resort to a deadly weapon when she could have left instead?" *Id.* at 276–77.

**F. Role of Expert Witnesses in BWS Cases.** Expert witnesses can help address the issues plaguing trials of BWS victims. "[T]he most important effect of such evidence is to assist the factfinders in considering or understanding other evidence presented in the case." DOJ Report at 14.

> With respect to the *deliberation process*, the major purposes of introducing evidence about battering and its effects are to assist the triers of fact in their deliberations about the ultimate issues or to dispel common myths and misunderstanding about domestic violence that may interfere with the factfinders' ability to consider issues in the case.

> . . . [E]xpert testimony concerning battering and its effects can help the factfinder more effectively evaluate the evidence in criminal cases involving a battered woman.

*Id.* at xii.

Expert testimony can address a number of issues. Experts may elucidate the BWS victim's state of mind and her perception of danger, dispel misconceptions about the patterns of abuse and response, and explain the risks in leaving a battering relationship. *Id.* at viii; Dowd, 19 Fordham Urb. L.J. at 578–79; Schuller & Vidmar, 16 Law & Hum. Behav. at 277. They may also opine on

> the effect of abuse on women; they give support to a woman's perception that her life was in jeopardy at the time of the homicide; and they show that her actions were reasonable for a person repeatedly subjected to assaults by her husband.

Leonard at 33. Indeed,

> [t]he reasonableness of the woman's fear and the reasonableness of her act are *not* issues which the jury knows as well as anyone else. The jury needs expert testimony on reasonableness precisely because the jury may not understand that the battered woman's prediction of the likely extent and imminence of violence is particularly acute and accurate.

Elizabeth M. Schneider, *Describing and Changing: Women's Self-Defense Work and the Problem of Expert Testimony on Battering*, 9 Women's Rts. L. Rep. 195, 211 (1986).

Additionally, expert BWS testimony provides jurors a perspective or framework "for interpreting the woman's beliefs and actions—an interpretive social schema from which to view her actions as reasonable rather than aberrant." Schuller & Vidmar, 16 L. & Hum. Behav. at 277. "If one just considers isolated incidents, it is difficult to understand if a woman has acted in self-defense." Russell at 103. In addition, "[m]ost people are incapable of intuitively understanding what it is like to live

within a violent home" and "evaluate normalcy or reasonableness of response based upon their own perceptions of *reasonable*, which are created out of their own often limited experience." *Id.* at 139. An expert can make "it . . . easier to understand the overall context and dynamics of the fear that surrounds the victim's life." *Id.* at 103. Experts "offer evidence that addresses research on domestic violence and link that evidence to supporting data on social contexts associated with the defendant," thereby "provid[ing] a richer context of the situation for jurors to evaluate whether the defendant's perceptions and actions were reasonable at the time of the killing." *Id.* at 134–35. BWS evidence can help the jury understand that "what happened to one woman can happen to anybody under similar circumstances" and "transform[] the battered woman into 'everywoman,' a reasonable person who uses force in self-defense." Dowd, 19 Fordham Urb. L.J. at 574.

The National Association of Women Judges agrees that testimony on the effects of battering is important when a battered person asserts self-defense.

> In many cases involving battered women, it is . . . necessary to bring in an expert witness to testify about battering and its effects to help jurors and judges understand the experiences, beliefs, and perceptions of women who are beaten by their intimate partners—information that the common lay person usually does not possess. Generally, in a self-defense case, this testimony is introduced to help the jurors better understand why, given this woman's experience of violence at the hands of her abuser, she was reasonable in her belief that she was in imminent danger.

Nat'l Ass'n of Women Judges, *Moving Beyond Battered Women's Syndrome: A Guide to the Use of Expert Testimony on Battering and Its Effects* iv (1995).

> It is essential that we increase understanding in the lay and legal communities about the role of an expert in supporting established defenses used by battered women, such as self-defense. In any self-defense case, the jury needs to have

information about why the defendant believed she had to defend herself—why, to use generic self-defense language, the defendant was reasonable in her belief that she was in imminent danger of death or great bodily harm. Any defendant claiming self-defense would want to bring in information about the deceased's history of violence against her or him; obviously this evidence would help the jury to better understand why the person was so afraid at the time of the incident.

Janet Parrish, Nat'l Ass'n of Women Judges, *Trend Analysis: Expert Testimony on Battering and Its Effects in Criminal Cases* 1–2 (1996).

Expert testimony can also explain why BWS victims make false confessions. For instance, some individuals are vulnerable to certain interrogation techniques, like the Reid technique, in ways that put those individuals at a higher risk of falsely confessing. Brief for Am. Psychological Ass'n as Amicus Curiae Supporting Appellant at 14–16, 23, *People v. Thomas*, 8 N.E.3d 308 (N.Y. 2014). Many battered women have those vulnerabilities. Walker at 456–60. False confessions and BWS share similar legal backdrops; both are complicated areas of social psychology that are "beyond the common experience of the ordinary person." *United States v. Whittle*, No. 3:13-CV-00170-JHM, 2016 WL 4433685, at *3 (W.D. Ky. Aug. 18, 2016). As a result, these linked doctrines should be carefully explained to jurors to refute commonly held assumptions and make jurors aware of these social circumstances. *Id.*

More generally, expert BWS testimony helps jurors assess credibility of a battered person who makes inconsistent statements. *Brown*, 94 P.3d at 583; *Earl v. United States*, 932 A.2d 1122, 1128–29 (D.C. 2007). In 2016, every member of this court joined one of two opinions recognizing that victims of domestic violence exhibit a tendency to recant statements made before trial. *State v. Smith*, 876 N.W.2d 180, 187–88 (Iowa 2016); *id.* at 194 (Waterman, J., dissenting) (explaining that "[t]he rate of

recantation among domestic violence victims has been estimated between eighty and ninety percent").

Empirical research backs up the idea that expert testimony on BWS is useful to jurors. "Research has consistently found that the use of expert testimony regarding [BWS] leads mock jurors to render more lenient verdicts and find women who kill their abusers generally more credible." Russell at 57, 219; see Schuller, 10 Duke J. Gender L. & Pol'y at 227. For instance, one study concluded that mock jurors were more likely to find mitigating circumstances when such testimony was introduced. Walker at 527. Other researchers have "found that individuals who are less informed about the dynamics of abuse often assign harsher sentences than their informed counterparts to battered women homicide defendants," Russell at 55, while better informed individuals find a BWS victim more credible, id. at 190. Similarly, "[r]esearch has demonstrated that informing jurors of their potential biases can help mock jurors to recognize their biases and evaluate cases in a more objective manner." Id. at 215. In a survey of self-reporting jurors, eighty percent of jurors exposed to expert BWS testimony "reported it was influential, and the more believable these subjects found the testimony, the more likely they were to render not guilty verdicts." Schuller & Vidmar, 16 L. & Hum. Behav. at 284.

Introduction of expert BWS testimony, of course, is not a panacea. Some studies have found that the circumstances of the abuse and homicide, along with the demographic characteristics of the woman and her batterer, may have a greater effect on jurors. See id. at 284–86. And researchers caution that mock jurors provided with expert evidence on BWS may find women who do not fit their preconceived stereotypes of BWS victims to be less credible than those who fit the stereotype. Russell at 8,

56; Russell & Melillo, 33 Crim. Just. & Behav. at 219, 225–26, 229–30. In addition, "use of the syndrome in court comes with perceptions that women are psychologically damaged in some way," even though it also leads to more lenient verdicts. Russell at 99, 193, 209. Those problems can be minimized "when [BWS] is used as a descriptive term to explain the experiences of *some* battered women," *id.* at 189, and potentially by focusing on PTSD or the effects of battering, *id.* at 214.

**G. Iowa Caselaw on Use of BWS Experts.** Our first case dealing with a BWS expert appears to be *Griffin*, 564 N.W.2d at 374–75. In that case, we held that Laurie Schipper had credentials we considered "impressive and [which] easily qualify her status as an expert on battered women." *Id.* at 374. We also held that Schipper properly testified to the medical and psychological syndrome present in battered women generally. The prosecution called Schipper to explain why BWS victims may be reluctant to testify against their batterer and why they may make a pretrial statement inconsistent with testimony at trial. *Id.* at 374–75. Schipper explained that BWS victims perceive further battering as inevitable, encounter "psychological terrorism," and as a result, convince the batterer she will not testify against him as "a life-saving coping skill." *Id.* We said that the testimony did not cross the line into testifying on the ultimate fact of an accused's guilt or innocence or the truthfulness of a complaining witness. *Id.* at 375.

In *Rodriquez*, 636 N.W.2d at 246, we held that a trial court properly admitted the prosecution's expert BWS testimony. On trial for assault and other charges, the defendant sought to prove that he did not intend to seriously injure his domestic partner, that he and the victim "did have some 'good times' together," and that he did not confine the victim against her will. *Id.* at 245–46. The prosecution introduced the BWS testimony to

rebut the arguments. *See id.* We said that the testimony gave the jury "context of the nature of their relationship" and "information that it needed to understand the significance and meaning of the defendant's conduct and to understand the victim's reaction to that conduct." *Id.* at 246. We concluded that BWS assisted the jury in resolving the disputed issues of confinement and intent and was therefore not erroneously admitted. *Id.*

In *State v. Shanahan*, 712 N.W.2d 121, 127 (Iowa 2006), we considered a direct appeal from a defendant's conviction of second-degree murder for killing her husband. Among the defendant's claims was that her trial counsel was ineffective for failing to reasonably investigate the defendant's mental health by obtaining a mental health examination as recommended by the director of the Iowa Coalition Against Domestic Violence. *Id.* at 143. The defendant contended that "the testimony of such a professional would have explained why she behaved in ways seemingly contradictory to her defense, as she believe[d] she suffered from post-traumatic stress syndrome and battered wives syndrome." *Id.* We preserved the claim for PCR because "[t]he record [was] devoid of any such recommendation, trial counsel's reasons for not obtaining an examination, and the results or benefits the trier of fact would have gleaned from such an examination." *Id.*

Our most recent decision on BWS, and the only one in which we addressed the merits of employing expert BWS testimony in aid of a justification defense, is *Frei*, 831 N.W.2d at 74–75. The defendant argued that to make out a claim of self-defense, she only needed to prove that she subjectively believed that her actions were justified. *Id.*

We rejected the defendant's argument for a purely subjective standard in BWS self-defense cases but acknowledged the objective component should take into account the circumstances faced by the BWS

victim. *Id.* at 75. "As applied to a battered woman," we explained, "an appropriately specific reasonableness inquiry might consider objective facts about the batterer, any history of violence, any failed attempts to escape abuse, and any other facts relevant under the circumstances." *Id.* We further stated that "expert testimony can aid in cautioning jurors that the behavior of battered women should not be lightly dismissed as inherently unreasonable." *Id.*

In summary, our decisions permit introduction of expert BWS testimony to contextualize the circumstances faced by a BWS victim. Such context is important, we have indicated, to assist the fact finder in evaluating the reasonableness of a BWS victim's actions and the credibility of associated testimony.

**H. Other Jurisdictions' Approach to Use of BWS Experts in the Context of Self-Defense.** Our view on BWS experts is generally shared by many jurisdictions. Expert testimony can help a jury assess whether a battered woman's actions were reasonable. *Nwoye*, 824 F.3d at 1136. "[E]xpert testimony on BWS may be relevant to contextualizing testimonial and documentary evidence regarding the relationship between the victim and the defendant." *State v. Curley*, 250 So. 3d 236, 247 (La. 2018). "Although a jury might not find the *appearances* sufficient to provoke a reasonable person's fear, they might conclude otherwise as to a reasonable person's perception of the *reality* when enlightened by expert testimony on the concept of hypervigilance." *People v. Humphrey*, 921 P.2d 1, 17 (Cal. 1996). Indeed, expert testimony is "critical in permitting the jury to evaluate [defendant's] testimony free of the misperceptions regarding battered women." *Id.* at 11 (alteration in original). Expert testimony dispelling common myths and misconceptions concerning BWS "may have a substantial bearing on the woman's perceptions and behavior." *State v.*

*Allery*, 682 P.2d 312, 316 (Wash. 1984) (en banc). The Pennsylvania Supreme Court explained,

> [B]ecause of the unique psychological condition of the battered woman and because of the myths commonly held about battered women, it is clear that where a pattern of battering has been shown, the battered woman syndrome must be presented to the jury through the introduction of relevant evidence.

*Stonehouse*, 555 A.2d at 785.

Every jurisdiction accepts expert BWS testimony to support claims of self-defense. Lauren Champaign, *Battered Woman Syndrome*, 11 Geo. J. Gender & L. 59, 59–60 (2010); *see Curley*, 250 So. 3d at 246 n.11 (collecting cases). "Battered woman's syndrome evidence [is] . . . relevant to defendant's credibility. It would . . . assist[] the jury in objectively analyzing defendant's claim of self-defense by dispelling many of the commonly held misconceptions about battered women." *Humphrey*, 921 P.2d at 9. Expert BWS testimony is admissible to "help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense." *State v. Koss*, 551 N.E.2d 970, 973 (Ohio 1990).

Moreover, courts have found the failure to present BWS expert testimony can be ineffective assistance of counsel. *See, e.g., People v. Day*, 2 Cal. Rptr. 2d 916, 917 (Ct. App. 1992), *abrogated on other grounds by Humphrey*, 921 P.2d at 8, 10; *State v. Zimmerman*, 823 S.W.2d 220, 226–27 (Tenn. Crim. App. 1991). In *Nwoye*, the court held that failure to present expert testimony on BWS was prejudicial because such testimony would have entitled the defendant to an instruction on duress and, taking the testimony and instruction together, there was a reasonable probability

the jury would have had a reasonable doubt respecting defendant's guilt. 824 F.3d at 1135.

In *Peterson*, the court held that failure to present expert testimony on BWS was ineffective assistance of counsel because without that testimony there was no foundation for the asserted defense of imperfect self-defense. *State v. Peterson*, 857 A.2d 1132, 1154 (Md. Ct. Spec. App. 2004). The *Peterson* court explained that although there was evidence adduced at trial regarding the abuse suffered by the defendant at the hands of the victim, that evidence alone could not establish the predicates necessary for imperfect self-defense. *Id.* Consequently, trial counsel's decision to not introduce BWS evidence could not be said to have been strategic; rather, it was based on a misunderstanding of law. *Id.*

In *Curley*, trial counsel rendered deficient performance, the Supreme Court of Louisiana said, because of his admitted ignorance in how to present a BWS claim and his failure to consider how expert testimony would be helpful to his client's case. 250 So. 3d at 249. The court found prejudice because expert testimony could have helped establish either a state of mind supporting a justification defense or circumstances warranting a conviction of manslaughter instead of second-degree murder. *Id.* at 249–50.

In *Stonehouse*, the Pennsylvania Supreme Court reversed a conviction and remanded for a new trial upon holding that trial counsel was ineffective in failing to present BWS evidence. 555 A.2d at 784–85. The court said,

> Had trial counsel introduced expert testimony about the battered woman syndrome, the actions taken by appellant . . . would have been weighed by the jury in light of how the reasonably prudent *battered woman* would have perceived and reacted to [her batterer's] behavior. Trial counsel proceeded to trial on the theory that appellant had

experienced psychological and physical abuse inflicted upon her by the victim and that at the time she shot [her batterer] she was acting in self-defense. There was no reasonable basis for trial counsel not to call an expert witness to counter the erroneous battered woman myths upon which the Commonwealth built its case. Thus, trial counsel was ineffective, and the absence of such expert testimony was prejudicial to appellant in that the jury was permitted, on the basis of unfounded myths, to assess appellant's claim that she had a reasonable belief that she faced a life-threatening situation when she fired her gun at [her batterer].

*Id.*

## V. Discussion.

**A. Whether the District Court Erred in Denying a Court-Appointed Expert.** We must determine whether the district court had authority to appoint an expert at public expense in the PCR proceeding. If so, we must then decide whether the court abused its discretion in not appointing the expert.

Section 822.5 provides that, except in certain situations not relevant here, "the costs and expenses of legal representation shall . . . be made available to the applicant in the preparation of the application, in the trial court, and on review if the applicant is unable to pay." Iowa Code § 822.5. We believe that provision necessarily authorizes appointment of an expert at state expense to those unable to pay because an expert may be required for the legal representation provided for under the provision.

Here, Linn moved twice for a court-appointed expert within the PCR proceeding. Each time, she explained that her court-appointed PCR counsel needed to retain a BWS expert in order to evaluate whether trial counsel was ineffective and BWS's relevancy to her justification defense. Her motion thus fits squarely within the authority under Iowa Code section 822.5 for appointment of experts.

In order for the PCR court to grant a motion for appointment of an expert, there must be a reasonable need for expert services. *See Dahl*, 874 N.W.2d at 352 (discussing court's discretion in appointment of investigator); *Wise v. State*, 708 N.W.2d 66, 69 (Iowa 2006) (discussing discretionary appointment of PCR counsel under Iowa Code section 822.5). In analogous circumstances relevant here, our cases have explored the contours of the right to expert services at state expense during criminal trials. *Compare State v. Coker*, 412 N.W.2d 589, 593 (Iowa 1987) (holding that trial court abused its discretion in denying motion for appointment of intoxication expert where intoxication was a central trial issue and, although there was a minimal factual record in support of the motion, the "request was not demonstrably frivolous, unreasonable, or unsupported factually"), *with State v. McGhee*, 220 N.W.2d 908, 914 (Iowa 1974) (holding that district court did not abuse discretion in denying request for psychiatric expert if "[n]o history as to any prior psychological imbalance on defendant's part was shown," "[n]o evidence was presented by defendant regarding any past mental aberration on his part," and defense counsel never specified why he needed a psychiatric expert to adequately defend or assure defendant a fair trial). As we have explained regarding appointment of PCR counsel, PCR courts would ordinarily be well advised to appoint an expert "because such appointment 'benefits the applicant, aids the trial court, is conducive to a fair hearing, and certainly helpful in event of appeal.' " *Wise*, 708 N.W.2d at 69 (quoting *Furgison v. State*, 217 N.W.2d 613, 615 (Iowa 1974)). Still, we also believe that "[w]hen the accused is merely embarking on a 'random fishing expedition' in search of a defense[,] courts are discouraged from allowing [s]tate funds for experts." *State v. Leutfaimany*, 585 N.W.2d 200, 208 (Iowa 1998).

We remain "committed to the liberal view on the admission of psychological evidence." *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014). "[E]xpert witnesses may express opinions on matters explaining the pertinent mental and physical symptoms of the victims of abuse." *State v. Allen*, 565 N.W.2d 333, 338 (Iowa 1997). When a woman suffered one incident of sexual assault, we held expert testimony on PTSD relevant and admissible because "[i]ndependent evidence showed that the complainant had experienced some of the symptoms of PTSD." *State v. Gettier*, 438 N.W.2d 1, 6 (Iowa 1989). Likewise, we have upheld the admissibility of expert BWS testimony in a number of cases. *Frei*, 831 N.W.2d at 74–75; *Rodriquez*, 636 N.W.2d at 246; *Griffin*, 564 N.W.2d at 374–75.

Other courts have approved state funding for BWS experts. In *People v. Evans*, 648 N.E.2d 964, 968–69 (Ill. App. Ct. 1995), on appeal from a criminal conviction, the Illinois court held that a trial court erred in refusing to award fees for a BWS expert. The defendant was a woman on trial for killing her abusive husband as he approached her. *Id.* at 965. She asserted self-defense. *Id.* The court determined that the expert's assistance was necessary in proving a crucial issue in the case—her mental state—and that the lack of funds for the expert would therefore prejudice the defendant. *Id.* at 968–69.

In *Dunn v. Roberts*, 963 F.2d 308, 310 (10th Cir. 1992), the defendant, Dunn, had dated her boyfriend for less than two months. She went on trial for aiding and abetting a series of crimes committed by her boyfriend. *Id.* at 309. The boyfriend inflicted various forms of psychological abuse on the defendant: "he . . . threatened to kill [her] many times, . . . he . . . subjected her to Russian Roulette with the .357 magnum, and . . . he . . . advised her that her family or other innocent

parties would be in danger if she contemplated leaving him." *Id.* at 310. The boyfriend also physically abused Dunn by choking her, though the nature of other physical abuse is unclear from the opinion. *Id.* at 310, 313.

Before trial, Dunn sought fees for an expert to investigate whether she suffered from BWS. *Id.* at 310–11. The expert's testimony, Dunn argued, was relevant to whether she had specific intent to aid and abet. *Id.* The trial court denied the requested fees, and Dunn was convicted. *Id.* at 311. Dunn brought a federal habeas challenge. *Id.* at 312.

The United States Court of Appeals for the Tenth Circuit explained its "focus [was] on whether Petitioner made a sufficient showing to the trial court that her mental condition at the time of the crimes would be a significant factor at trial." *Id.* at 313. The court found Dunn carried her burden of proof. *Id.* The court said,

> [T]he state trial judge was made aware in general terms of [the boyfriend's] threats against and physical abuse of [Dunn] and that evidence of battered woman's syndrome would likely have bearing on whether [Dunn] had the state of mind necessary to commit the crime of aiding and abetting. [Dunn's] counsel explained clearly that the state's case against [Dunn] rested heavily on an aiding and abetting theory; that specific intent to assist . . . is a necessary element of the crime of aiding and abetting; that [Dunn's] case rested on her ability to show that she lacked the requisite intent; and that [Dunn] could not develop an effective rebuttal of that element without the assistance of an expert. We conclude that [Dunn] made a compelling showing that her mental state would be a central issue at trial. Given the facts before the state trial judge and the defense counsel's explanation for requesting expert assistance, we conclude the state trial court should have known that a refusal of [Dunn's] request for expert assistance would deny [Dunn] an adequate opportunity to prepare and present her defense.

*Id.*

Some courts have denied state funding for a BWS expert. For instance, in two appeals from criminal convictions, courts upheld denials

when a defendant had a previous opportunity for an expert psychological examination. *Ledford v. State*, 333 S.E.2d 576, 576–77 (Ga. 1985); *State v. Aucoin*, 756 S.W.2d 705, 714 (Tenn. Crim. App. 1988).

We believe Linn demonstrated a reasonable need for an expert to evaluate trial counsel's ineffectiveness and understand BWS's relevancy to her justification defense. In her 2015 motion for a court-appointed expert, she explained,

> [D]uring the trial, [Linn] testified on her own behalf that (a) her older sister had been murdered by her (i.e., the older sister's) boyfriend; (b) that Blanchard had told [Linn] that he had killed someone in the past, that he had brutally beat his prior girlfriend and that [Linn] better not piss him off; and (c) that she was scared of Blanchard and she "just wanted to get out (of the relationship) safe. I didn't want it to ever turn violent."

> [I]n speaking with law enforcement immediately following the shooting [Linn] made comments about Blanchard not hurting her anymore, and that she was tired of being hurt and Blanchard wasn't going to do it anymore.

> [T]rial counsel failed to call an expert witness to testify regarding "battered woman syndrome," despite the fact that [Linn] raised that issue with trial counsel prior to trial.

By the time the district court ruled on Linn's motion, and after another motion for a court-appointed expert, the record contained further facts on the psychological, verbal, and physical abuse Blanchard inflicted on Linn.

Blanchard's pattern of abuse is consistent with the type of abuse that causes BWS. Blanchard committed verbal and psychological abuse—including repeated threats to cut Linn up the length of her body and rape her while she was bleeding, adamant threats that "he would hurt [Linn] or any other individual . . . if [he] even [thought] [she was] with another individual," warnings that she "better not f***ing piss him off" in light of his history of violence, intimations that "nobody else [was] going to ever have [her]," and thefts of her property—consistent with that which gives

rise to BWS. Leonard at 15–16 (explaining that forms of psychological abuse include threats to kill or harm a woman or her children, verbal abuse, required secrecy, and fear arousal); Walker at 9, 21, 92 (explaining that batterers exhibit jealousy, cursing, and controlling behavior). Even if Blanchard had not physically abused Linn, she still might have been a BWS victim as a result of the psychological abuse. *See Nguyen*, 520 S.E.2d at 908; Dutton, 21 Hofstra L. Rev. at 1204; Stark, 58 Alb. L. Rev. at 986, 1005; Williams, 10 L. & Ineq. at 110. We have "conclude[d] psychological force . . . may give rise to a conviction under the 'against the will' element of [sexual abuse in the third degree]." *Meyers*, 799 N.W.2d at 146.

Evidence was presented that Blanchard did physically abuse Linn during their relationship. Linn testified that Blanchard clotheslined her. Additionally, according to a police officer's testimony, Linn stated after the shooting that Blanchard "hurt her in the past and was going to hurt her tonight." These indications of physical violence are also consistent with the type of abuse that causes BWS. Leonard at 15–16; Walker at 22.

Moreover, Linn's concern about violence once she tried to end the relationship—she "just wanted to get out safe" and "didn't want it to ever turn violent"—along with the physical and psychological violence and thefts she faced at that time, are all consistent with the heightened danger faced by BWS victims who try to leave their abusers. *See Nwoye*, 824 F.3d at 1138; Leonard at 8; Russell at 111. As our precedent establishes, previous BWS experts have testified that "statistically, a battered woman is in the most danger when she tries to leave an abusive relationship." *Rodriquez*, 636 N.W.2d at 245.

The duration of Linn's relationship with Blanchard cannot be used as a yardstick to measure whether she has a reasonable need for a BWS expert. It is difficult to speculate based solely on the duration of the

relationship what effect such abuse had on an individual. Sackett & Saunders at 132. Roughly forty percent of individuals who experience intimate partner abuse are victimized "over a relatively short time period." Stark, *Coercive Control* at 52. In *Dunn*, 963 F.2d at 309–10, the Tenth Circuit held the state erroneously deprived a defendant of funding for a BWS expert when she dated her boyfriend for less than two months. In *Brown*, 94 P.3d at 575, the California Supreme Court approved of expert testimony akin to BWS when a woman suffered only one incident of abuse.

Further, the State concedes that "BWS evidence would likely have been admissible" at Linn's criminal trial. Seemingly contrary to its concession, however, the State also suggests that Linn's trial was "*not* a BWS case" because, according to the State, "Linn described an ongoing physical confrontation as the incident that made her fear for her life and led to the fatal shooting." But as we have explained, contrary to common assumptions, BWS victims are most likely to use lethal violence against a batterer during an attack in which they perceive a threat of immediate harm.[8] Kadish at 855; Leonard at 25. At the time of Blanchard's death, he was threatening to rape and kill her and was choking her with one hand around her throat. She "felt that [she] was being choked to die, or to submit."

Indeed, many aspects of BWS are not within lay knowledge. *Wilson*, 487 N.W.2d at 824; *Hennum*, 441 N.W.2d at 798; *Townsend*, 897 A.2d at 327; *Ordway*, 619 A.2d at 827; Leonard at 30; Russell at 191; Schuller & Vidmar, 16 L. & Hum. Behav. at 282–83. Defense attorneys are often unfamiliar with how to approach BWS. Leonard at 30. Those facts bolster

---

[8]Our observation does not imply that BWS testimony is irrelevant or unuseful in cases lacking a physical confrontation at the time a BWS victim acts in purported self-defense. *See Frei*, 831 N.W.2d at 75; *Robinson*, 417 S.E.2d at 91; *see also* Leonard at 45 (explaining why some battered women kill their batterer while he is asleep).

Linn's asserted need for an expert to help her and her PCR counsel to apply specialized knowledge to the facts of her claim. And, in this case, her need for an expert is inextricably tied to her claim—PCR counsel cannot rely on the record to evaluate or advocate Linn's claim precisely because BWS evidence was not presented at trial. Without a BWS expert in this proceeding, PCR counsel is adrift in pressing the claim.

Therefore, Linn's request is no random fishing expedition. The factual matters in the record and her asserted need reasonably demonstrate that a BWS expert is required to guide her, her PCR counsel, and the courts in evaluating her claim. *See Dunn*, 963 F.2d at 313; *Evans*, 648 N.E.2d at 968–69. There is no indication in the record that she previously had a psychological examination concerning BWS. *See Ledford*, 333 S.E.2d at 576–77; *Aucoin*, 756 S.W.2d at 714. In short, by seeking expert BWS testimony, she is "fishing in the right pond." Consequently, by denying her request, the PCR court abused its discretion.

**B. Whether the District Court Erred in Granting Summary Disposition.** We now consider whether the district court erred in granting summary judgment in this case.

The goal of summary disposition in PCR proceedings "is to provide a method of disposition *once the case has been fully developed by both sides*." *Manning*, 654 N.W.2d at 559 (quoting *Hines*, 288 N.W.2d at 346). Yet the district court granted summary disposition while Linn was waiting to learn whether the district court would approve her request for a court-appointed expert. The failure to appoint an expert cannot be cited as a basis for summary judgment when the court erroneously denied the appointment of such an expert.

In addition, we do not agree with the district court's determination that the undisputed record established that counsel made a strategic

decision not to pursue BWS. Trial counsel was not deposed in the PCR proceeding, so the record does not reveal what strategic judgments might have been coursing through the mind of counsel. In any event, at trial, Linn asserted two defenses—accident and self-defense. To the extent there is an inconsistency between the two theories, Linn already presented that inconsistency by asserting both theories at trial. Introduction of BWS testimony to support either or both defenses would not have compounded the purported inconsistency. Counsel had already made the strategic judgment exactly the opposite of that now claimed by the State, and determined by the district court, to be undisputed.

Attempting to support the district court's order on this point, the State argues that Linn's claim resembles the claim considered in *State v. Sallie*, 693 N.E.2d 267, 270 (Ohio 1998). We disagree. In *Sallie*, the defendant's trial theory was that the shooting was an accident. *Id.* The *Sallie* defendant did not claim self-defense. *Id.* The court concluded that BWS evidence was immaterial because "trial counsel might reasonably have determined evidence explaining and rationalizing why Sallie might intentionally shoot Brown would appear inconsistent with the theory of accident, thereby diminishing Sallie's credibility." *Id.* By contrast, Linn already claimed accident *and* self-defense.

Courts have determined that BWS is relevant to either, or both, of the defenses Linn asserted at trial. We have explained that BWS testimony is relevant to both the subjective and objective components of a self-defense claim. *See Frei*, 831 N.W.2d at 75; *see also State v. Kelly*, 478 A.2d 364, 378 n.13 (N.J. 1984) (collecting cases holding BWS is relevant to objective and subjective components of self-defense). The Supreme Court of West Virginia held that BWS is relevant to a defendant's state of mind even when accident, as opposed to self-defense, is asserted. *State v.*

*Stewart*, 719 S.E.2d 876, 880, 888 (W. Va. 2011). Likewise, the California Court of Appeals held that a defendant who relied on a defense of accident at trial was prejudiced by her trial counsel's failure to introduce BWS testimony. *In re Walker*, 54 Cal. Rptr. 3d 411, 414 (Ct. App. 2007). That decision overruled the court's previous holding to the contrary. *See id.* at 413–14. And the Supreme Court of New Jersey explained, in a case where the defendant grabbed a pair of scissors trying to scare away the victim but instead stabbed him, that BWS is relevant when self-defense is asserted to a criminal charge in which recklessness suffices to establish culpability. *Kelly*, 478 A.2d at 369, 376 n.12. Linn's jury, like that of the defendant in *Kelly*, considered a charge of reckless manslaughter as a lesser included offense. As a result, the district court's conclusion that counsel must have necessarily made a strategic choice does not support the grant of summary judgment in this case.

**VI. Conclusion.**

For the reasons expressed above, we vacate the court of appeals decision and reverse the trial court judgment. We remand to the trial court for further proceedings.[9]

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except McDonald, J., who takes no part.

---

[9]Because we reverse the trial court's judgment and remand for further proceedings, we need not consider Linn's argument that her PCR counsel was ineffective.