# IN THE COURT OF APPEALS OF IOWA

No. 18-2085
Filed December 18, 2019

**BENJAMIN ELLIOTT LANE,**
　　Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
　　Respondent-Appellee.
_____

　　Appeal from the Iowa District Court for Black Hawk County, Bradley J. Harris, Judge.

　　An inmate appeals the denial of his application for postconviction relief. **AFFIRMED.**

　　Benjamin D. Bergmann and Gina Messamer of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

　　Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee State.

　　Considered by Tabor, P.J., and Mullins and May, JJ.

**TABOR, Presiding Judge.**

Benjamin Lane is serving an indeterminate fifty-year prison sentence on his convictions for sexual abuse in the second degree and burglary in the first degree. On direct appeal, we upheld the district court's denial of Lane's motion to suppress and found sufficient evidence for his convictions. Now, in his push for postconviction relief (PCR), Lane contends his trial counsel was remiss in numerous ways. On de novo review, we find Lane received competent representation in his criminal case and affirm the PCR court's denial of relief. We also reject his claim of an illegal sentence.

## I. Facts and Prior Proceedings

In September 2013, a man wearing a ski mask and dark clothing opened the door to nineteen-year-old J.C.'s bedroom in the early morning hours. The intruder displayed a knife and warned, "If you scream, I'll kill you." He covered her mouth with duct tape. The intruder then brutalized and sexually assaulted J.C.

After the intruder left, J.C. peeked out her window and saw the taillights of a Ford Mustang. J.C. suspected the driver was Lane because he was in her apartment earlier in the evening playing video games with one of her roommates. J.C. also remembered Lane had parked that model of car on the street when he was visiting. J.C. also suspected Lane was the intruder based on his heavy-set build. J.C. asked one of her roommates to call 911. When the police arrived, J.C. placed Lane in the spotlight as the prime suspect. Police also learned Lane once lived at the same apartment, before J.C. moved in, and may have retained a key.

The investigating officer noted J.C. was bleeding from the sexual assault. An ambulance took J.C. to the hospital where she required surgery to repair vaginal lacerations.

Meanwhile, officers went to the house where twenty-one-year-old Lane lived with his parents. They found a "still warm" Ford Mustang parked outside. After knocking at the door at 5:30 a.m., the officers explained their investigation and asked Lane if he would come to the Cedar Falls police station to answer some questions. Lane's mother drove him to the station in her car.

When Lane arrived at the station, Investigator Gavin Carman instructed his mother to wait in the lobby while they interviewed him. She said: "Well, then I'll send an attorney." The officer said Lane did not need an attorney because he was just giving a statement. Turning to Lane, the officer said: "You don't want an attorney, do you, Ben?" Lane responded, "Mom, I'm fine."

Investigator Carman took Lane to an interview room, placing him closest to the door. Lieutenant Brooke Krantz advised Lane he was free to leave. Lane retained possession of his cell phone throughout the interview. Those two officers, neither in uniform, questioned Lane about the sexual assault. Intially, Lane denied going to J.C.'s room after he had left the house that night. Lane said he went to Taco Bell and then to his house.

During the interview, officers saw dried blood on Lane's knee. Lane could not explain how the blood got there. The officer asked if he had suffered any injury, and Lane said no. The officer then asked for Lane's consent to a search of his person, including taking a sample of the dried blood. Lane consented.

Lane also consented to a search of his vehicle but said he felt like he was being forced. Because the car was registered to Lane's mother, the officers obtained a search warrant. As they obtained the warrant, the officers told Lane he was no longer free to leave. An officer informed Lane of his *Miranda* rights and left him alone in the interview room.

A few minutes later, Lane knocked on the door to catch the officer's attention. Lane asked to speak with his mother, but the officer informed him that she had left. Just a few seconds after the officer returned to his desk, Lane called him again. As soon as the officer opened the door, Lane blurted out: "I did it. I'm pleading guilty."

After that spontaneous confession, Investigator Carman advised Lane to sit down and they would talk. The officer found Lane breathing heavily and in a state of distress, repeating he did not know why he did what he did. The officer asked follow-up questions to have Lane provide a sequence of events. Lane admitted keeping a key from when he was a tenant. Lane recounted the path he took to J.C.'s room. Lane explained what he did when he was in J.C.'s room. He also provided the exact locations of key evidence. The items included a knife, duct tape, pants, and socks. The officer took DNA swabs from Lane's hands, mouth, and knee. Testing confirmed J.C.'s blood was on the knife, the duct tape, Lane's pants, his sock, and his knee.

The State charged Lane with burglary in the first degree, in violation of Iowa Code section 713.3 (2013), and sexual abuse in the second degree, in violation of section 709.3. A few months later, Lane moved to suppress his statements and related evidence, claiming (1) he was denied his rights under Iowa Code section

804.20 because police did not allow him to see his mother; (2) he did not knowingly and intelligently waive his Miranda rights; and (3) he did not knowingly, voluntarily, and intelligently consent to a search of his person.

After a hearing, the district court denied the motion to suppress. The court found the police had not violated section 804.20. The court determined the officer properly gave Lane his Miranda warnings, and Lane understood and acknowledged those rights. The court additionally concluded Lane voluntarily consented to a search of his person. After losing his suppression motion, Lane waived his right to a jury trial. At the end of his bench trial, the district court found Lane guilty as charged. The court specifically found, "J.C.'s testimony was highly credible." Our court affirmed his convictions against claims the district court improperly denied his motion to suppress and the record contained insufficient evidence of his guilt. *State v. Lane*, No. 14-1449, 2015 WL 8388361, at *6, *9 (Iowa Ct. App. Dec. 9, 2015)

In January 2017, Lane petitioned for postconviction relief. The parties agreed to submit the case on exhibits and briefs without a trial. In November 2018, the district court issued an order denying Lane's PCR petition. He now appeals.

## II. Scope and Standards of Review

In general, we review PCR proceedings for the correction of errors at law. *Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010). We review claims of ineffective assistance of counsel de novo because they are grounded in the Sixth Amendment. *See State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015). We also review cruel-and-unusual sentencing claims de novo. *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009).

### III. Analysis

#### A. Overview of Lane's Ineffective-Assistance Claims

Lane alleges his criminal trial counsel was ineffective in five ways: (1) counsel failed to seek suppression of Lane's statements under the standards in the Iowa Constitution; (2) counsel failed to effectively challenge the admission of character evidence; (3) counsel failed to challenge the admission of the full video-recording of J.C.'s interview with police; (4) counsel failed to adequately advise him of the consequences of waiving a jury trial; and (5) counsel failed to pursue a beneficial plea deal.[1] Lane also contends the cumulative nature of these alleged errors resulted in prejudice. We will address each claim in turn.

Lane bears the burden to show a breach of duty by trial counsel and resulting prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first prong of *Strickland*, "we measure counsel's performance against the standard of a reasonably competent practitioner." *Linn v. State*, 929 N.W.2d 717, 731 (Iowa 2019). We presume the attorney performed his duties competently. *Id.* We measure counsel's performance objectively by determining whether the representation was reasonable under prevailing professional norms, considering all circumstances. *Id.*

Under the second prong of *Strickland*, Lane must establish prejudice resulted from counsel's failure to perform an essential duty. *See id.* Lane may do so by showing counsel's errors were so grave that they deprived him of a fair trial.

---

[1] Lane raises a sixth claim of ineffective assistance, claiming counsel was remiss in failing to challenge his sentence as cruel and unusual. The State points out Lane may challenge an illegal sentence at any time. *See Bruegger*, 773 N.W.2d at 871. We agree and address the sentencing claim outside the ineffective-assistance framework.

*See id.* Stated differently, Lane must prove a reasonable probability exists that but for counsel's unprofessional errors, the result of the proceeding would have been different. *See id.* That probability must be sufficient to undermine our confidence in the outcome. *Id.*

Lane must prove both prongs to merit relief. *See State v. Liddell*, 672 N.W.2d 805, 809 (Iowa 2003).

But before tackling his individual claims, we pause to address Lane's overarching argument that the guarantee of "assistance of counsel" in article I, section 10 of the Iowa Constitution should be set on higher standard than the national norm under the Sixth Amendment of the United States Constitution. As the State notes, Lane did not ask the Iowa Supreme Court to retain this appeal. Because our court is without authority to reach the merits of Lane's novel legal approach, his argument gains no traction here. *See State v. Miller*, 841 N.W.2d 583, 584 n.1 (Iowa 2014) ("Generally, it is the role of the supreme court to decide if case precedent should no longer be followed.").

**1.    Was trial counsel ineffective for not moving to suppress Lane's statements under state constitutional standards?**

Lane first contends trial counsel rendered ineffective assistance by failing to argue for suppression of his confession under the Iowa Constitution. Lane maintains the officer violated his rights by suggesting he did not need an attorney. Lane argues counsel should have seen this case as an opportunity to lobby for a reversal of *State v. Morgan*, 559 N.W.2d 603 , 604(Iowa 1997), which followed *Davis v. United States*, 512 U.S. 603 ,612 (1994), in holding a suspect's request for counsel must be unambiguous. Lane contends counsel should have

piggybacked on Justice Appel's special concurrence in *State v. Effler,* 769 N.W.2d 880, 894 (Iowa 2009), to challenge *Morgan.*

The PCR court rejected Lane's contention, noting counsel did move to suppress his client's confession under article I, section 9 of the Iowa Constitution. It is true counsel did not specifically argue that *Morgan* should be overturned. But counsel had no duty to do so. *See Snethen v. State*, 308 N.W.2d 11, 16 (Iowa 1981) (holding counsel not ineffective for failing to raise an issue contrary to established case law). Lane's argument fails on the breach-of-duty prong.

**2.      Was trial counsel ineffective for opening the door to evidence of Lane's bad character?**

Lane next argues counsel was ineffective for introducing evidence of his good character at trial thereby clearing the way for the State to introduce evidence of his affinity for knives, violent video games, and pornography. A defendant may elect to put his character in issue by producing evidence of his good attributes to show "improbability that he committed the crime." *State v. Hamann*, 285 N.W.2d 180, 184 (Iowa 1979). That testimony opens the door for rebuttal by the prosecution. *State v. Scalf*, 119 N.W.2d 868, 872 (Iowa 1963).

To set the stage, defense counsel introduced evidence of Lane's peaceful nature. That evidence allowed the State to offer evidence Lane 1) played with knives; 2) viewed rape simulation pornography; and 3) joked about rape and killing. Lane contends that evidence "tainted the factfinder."

The State argues counsel followed a viable strategy at the bench trial. The PCR court considered counsel's testimony:

> I was just trying to get some positive evidence before the judge for just the purpose of letting him know that Mr. Lane wasn't just all about this very violent crime that he had committed, in hopes that that would make some difference in the fact-finder's mind as far as some of the arguments that we were making down the road at sentencing.

Lane contends counsel did not present a "valid strategic reason" for opening the door to the damning character evidence. Normally, miscalculated trial strategies do not rise to the level of ineffective assistance of counsel. *Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008). But we need not decide if counsel breached a duty because Lane cannot show prejudice resulting from this defense strategy.

After Lane lost his motion to suppress, the district court could consider his confession, which satisfied most of the elements of burglary and sexual abuse. As the PCR court noted, the only remaining issues at the bench trial were (1) whether Lane entered the apartment without authority and (2) whether he was armed with a dangerous weapon or threatened to use force creating a substantial risk of death or serious injury. The evidence of Lane's bad character had little bearing on those remaining legal questions. Nor did the district court mention that evidence in its written verdict. Like the PCR court, we find no reasonable probability of a different outcome had counsel handled the character evidence differently. *See State v. Carey*, 709 N.W.2d 547, 560 (Iowa 2006) (finding no prejudice where "State's evidence was extremely strong").

**3.	Was counsel ineffective for agreeing to admission of the victim's full interview with police?**

Police took a statement from J.C. at the hospital.  The video recording was about an hour long.  Defense counsel offered the video into evidence so the court could "view the motions the victim made in describing what was done with the knife" and "the victim's hand gestures in describing the length of the knife."  The State argued the entire statement should come into evidence under the "rule of completeness."[2]  Defense counsel agreed to admission of the entire interview.

In his PCR action, Lane contends counsel was ineffective in agreeing to admission of the full video because it was "hearsay and unduly prejudicial."  Lane contends the full video was not admissible under rule 5.106(a) because the entire interview was not necessary for the court to understand J.C.'s description of the knife.  The State does not discuss the rule of completeness on appeal, instead arguing, "J.C.'s video interview was, at most, cumulative of other evidence that was introduced at trial, and its admission could not have prejudiced Lane."

During his deposition, counsel defended introduction of the entire video, recalling the victim's interview included "a lot of inconsistent statements" and "she really overdramatized some things, and so I think we were able to make some hay with that."  The PCR court found counsel made a strategic decision to allow the

---

[2] Iowa Rule of Evidence 5.106(a) codifies the common law "rule of completeness."  Laurie Kratky Dore, Iowa Practice, Evidence § 5.106:1 (November 2019).  It provides:
> If a party introduces all or part of an act, declaration, conversation, writing, or recorded statement, an adverse party may require the introduction, at that time, of any other part or any other act, declaration, conversation, writing, or recorded statement that in fairness ought to be considered at the same time.

Iowa R. Evid. 5.106(a).

court to consider J.C.'s entire interview. We reach that same finding. When counsel follows a reasonable strategy, "we will not interfere simply because it did not achieve the desired result." *State v. Newman*, 326 N.W.2d 788, 795 (Iowa 1982).

**4.    Was counsel ineffective in allowing Lane to waive a jury trial?**

Lane argues his attorney did not properly advise him of the consequences of waiving his right to a jury trial. Lane contends had he known appellate and PCR courts review verdicts in bench trials more deferentially than jury verdicts, he would not have waived his constitutional right to a jury trial.

On appeal, Lane provides no authority for his position that trial counsel had a duty to inform him about differing standards of appellate review before he could intelligently waive his right to a jury. As the PCR court points out, the trial record shows Lane made a knowing and voluntary decision to waive a jury and submit his case to a judge. Defense counsel testified Lane and his family were "pretty adamant that they didn't want a jury" and counsel agreed with that assessment, given the nature of the crime and the technicality of the legal issues. On this record, we find no breach of duty.

**5.    Was counsel ineffective for not pursuing a beneficial plea deal?**

Lane insists trial counsel was ineffective for not trying to negotiate a plea bargain where the State would reduce the sexual abuse charge from second degree to third degree. Lane relies on *Dempsey v. State*, for the proposition that "[a] defendant is entitled to the effective assistance of counsel in the plea bargaining process." 860 N.W.2d 860, 868 (Iowa 2015). But *Dempsey* does not

help Lane. That case involved the soundness of counsel's advice concerning the State's plea offers. *Id.* at 870–73.

Here, the prosecutor's only offer was for Lane to plead guilty as charged in exchange for the State's recommendation of concurrent sentences. The prosecutor sent defense counsel an email confirming: "This is the only offer the State is going to make." The prosecutor also suggested the State might add a class "A" felony charge if Lane insisted on going to trial. Against this backdrop, Lane cannot show defense counsel would have had any chance of success in securing a plea deal to a lesser charge.

The PCR court found: "Trial counsel was familiar with the prosecutor and aware of her practices in plea negotiations." The court concluded counsel was not ineffective in the plea bargaining process. We agree, even if defense counsel had proposed a more favorable deal, Lane cannot show a reasonable probability the State would have agreed.

**6.     Did Lane suffer cumulative prejudice from counsel's errors?**

As a final measure, Lane contends his attorney's "multiple unprofessional errors" resulted in prejudice.[3] Iowa law recognizes several errors by counsel may accumulate to satisfy the prejudice prong of the *Strickland* test. *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012). But Lane did not meet his burden on any of his ineffective-assistance claims. So he has not shown cumulative error meriting relief. *See State v. Veal*, 564 N.W.2d 797, 812 (Iowa 1997), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998).

---

[3] The State contends Lane did not preserve error on his cumulative-error claim in the PCR court. Regardless of preservation, we opt to address the merits.

**B.     Was Lane's sentence cruel and unusual?**

The district court sentenced Lane to two indeterminate twenty-five year prison terms to run consecutively.  His conviction for sexual abuse in the second degree carries a seventy percent mandatory minimum.  *See* Iowa Code § 902.12(1)(c).  On appeal, Lane contends this sentence—as applied to "an immature twenty-one year old"—is cruel and unusual under article I, section 17 of the Iowa Constitution.[4]

Our review of his gross-disproportionality challenge follows the three-part analysis established in *Solem v. Helm*, 463 U.S. 277, 292 (1983).  *State v. Oliver*, 812 N.W.2d 636, 647 (Iowa 2012).  First, we employ a threshold test that balances the gravity of the crime against the severity of the sentence.  *Id.*  This step proves fatal to almost all gross disproportionality claims—"it is rare that a sentence will be so grossly disproportionate to the crimes as to satisfy the threshold inquiry and warrant further review."  *State v. Musser*, 721 N.W.2d 734, 749 (Iowa 2006).  Second, if the threshold test has been crossed, the court compares the challenged sentence to sentences for other crimes within the jurisdiction. *Bruegger*, 773 N.W.2d at 873.  Third, the court compares sentences in other jurisdictions for the same or similar crimes.  *Id.*

When deciding if Lane can establish an inference of gross disproportionality, we are first mindful that "we owe substantial deference to the penalties the legislature has established for various crimes."  *Oliver*, 812 N.W.2d at 650.  Here, the legislature decided that sexual abuse involving a dangerous

---

[4] "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17.

weapon or the substantial risk of death or serious injury called for a severe sentence. *See* Iowa Code §§ 709.3(1)(a), 902.12(1)(c). Unlike *Bruegger*, this case does not involve a "broadly framed crime" carrying a dramatic sentencing enhancement for repeat offenders. *See* 773 N.W.2d at 884.

While Lane was a first-time offender, his crime was brutal and took a grave toll on J.C. and her family. In her victim impact statement, J.C. described her intense pain, fear, and ongoing depression and anxiety. The severity of the sentence was commensurate with the gravity of the crime. *See id.* at 886 (recognizing harm to victim as part of gross-disproportionality calculus). Because Lane's argument does not satisfy *Solem's* threshold test, we need not reach the second and third steps. Lane fails to show his sentence constituted cruel-and-unusual punishment.

**AFFIRMED.**