# IN THE COURT OF APPEALS OF IOWA

No. 22-0511
Filed August 21, 2024

**CHRISTOPHER JOSEPH YENGER,**
      Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
      Respondent-Appellee.
_____

Appeal from the Iowa District Court for Wapello County, Lucy J. Gamon, Judge.

An applicant appeals the denial of postconviction relief. **AFFIRMED.**

Alexander Smith of Parrish Kruidenier, LLP, Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee State.

Considered by Tabor, C.J., and Greer and Schumacher, JJ.

**TABOR, Chief Judge.**

Christopher Yenger seeks postconviction relief (PCR) from his two felony murder convictions. He alleges his trial attorneys were ineffective for not calling an expert witness to challenge the State's arson investigation. The district court denied relief, finding Yenger failed to show that the attorneys' strategic decisions breached an essential duty or prejudiced Yenger's defense. In our de novo review, we reach the same conclusions and affirm.

## I.        Facts and Prior Proceedings

D.J. Huffman turned twenty-one in March 2006. He planned a poker party at his house to celebrate. He invited his friends Seth Anderson, Nate Messer, and Zach Richards. Among the more than twenty other guests who arrived after the poker game were Kyle Jameson, Zach Dye, and Yenger. Beer flowed freely at the party, and a fight broke out. Yenger got punched and left with a bloody nose.[1] As Dye and Jameson later recalled, Yenger was angry and wanted to return to the party to set the house on fire. According to Dye, on the way back to Huffman's house, they stopped at a gas station where Yenger fashioned a "Molotov cocktail"[2] from a beer bottle filled with gas and plugged with a paper towel. Back at the party,

---

[1] In a 2016 interview with Iowa Division of Criminal Investigation Special Agent Don Schnitker, Yenger recalled: "I did get my ass beat." But Yenger maintained that after the fight he went to his own apartment and "passed out."

[2] The name "Molotov cocktail" was given to incendiary bombs by Finnish forces during the Winter War in 1939. The eponym derived from dark humor invoking Vyacheslav Molotov, then-Soviet Minister of Foreign Affairs. Molotov claimed that the Soviet Army was not dropping bombs on the Finns but was rather air-dropping food to the starving Finnish population. Anthony Carl, *Paradigm Perplexities: Does International Humanitarian Law or International Human Rights Law Govern the Gaza Border Protests of 2018-2019, & What Are the Consequences? A Response to the Supreme Court's Opinion in Yesh Di*, 3 Int'l Comp. Pol'y & Ethics L. Rev. 1193, 1263 n.256 (2020).

Yenger lit the paper and threw the bottle at the house. Both Dye and Jameson remembered seeing flames as they drove off.

In the early morning hours, Huffman awoke to Richards pulling him out of bed because the house was on fire. Huffman and Richards made it to safety. But fire investigators found the bodies of Anderson and Messer while processing the scene. The state medical examiner determined that they died of carbon monoxide poisoning from inhaling the smoke.

After they learned of the deaths, Dye remembers Yenger telling him: "We're fine . . . just stick to the script." What was the script? "That we went to the party. A fight broke out. We left the party and went home and passed out." And they indeed stuck to that script when State Fire Marshall agents interviewed them. Without any solid leads, Special Agent Jeff Shatzer wrote a report designating the origin of the fire as "undetermined."

Then, almost a decade later, a tip came in. Hoping to broker a deal on his pending criminal charges, an inmate at the Wapello County Jail told an Ottumwa police officer in 2015 that about a year earlier Yenger divulged that "he was involved in a house fire that killed two boys." The inmate recalled Yenger admitting that he "firebombed the place that the party was at."

Prompted by that information, agents conducted a new round of interviews. In those sessions, Jameson soon dropped the script and admitted going back to the party because Yenger wanted to burn down the house.

The State charged Yenger with two counts of felony murder for the deaths of Anderson and Messer. While in jail pretrial, Yenger told another inmate, Christopher Showalter, that "he had two bodies and that's what he was there for."

Showalter also overheard Yenger yell to fellow inmate Dye: "Keep your head up. Keep your stories straight. We can get through this if our stories match."

At Yenger's trial, the prosecution called fifteen witnesses, including Jameson, Dye, and special agent Shatzer.[3] The defense called no witnesses. The jury found Yenger guilty as charged. And our court affirmed his convictions on direct appeal. *See State v. Yenger*, No. 17-0592, 2018 WL 3060251, at *6 (Iowa Ct. App. June 20, 2018).

In September 2018, Yenger applied for PCR. In his amended application, filed in May 2019, Yenger alleged:

> Trial counsel rendered prejudicial ineffective assistance by failing to retain a fire expert for the defense and to present expert testimony and/or scientific evidence at trial in support of the defendant's theory that the fire was accidental and not started by gasoline from outside the house and to refute the State's theory of the case.

At the PCR hearing in February 2022, Yenger's defense counsel, Aaron Siebrecht and Michael Jones, testified that they did hire a fire expert, Tim Petit, to testify at the murder trial. But in his deposition, Petit could not rule out arson. In questioning by the prosecutor, Petit acknowledged that arson was "a possibility." So after Shatzer told the jury that he could not determine a source for the fire, defense counsel huddled with their client and decided not to call their expert because they didn't think he could add anything. What's more, Attorney Siebrecht

---

[3] Although Shatzer amended his report in 2016 to designate the fire as "incendiary" meaning "intentionally set," he testified at trial that he did not have an opinion within a reasonable degree of scientific certainty where the fire started and recorded the source of the fire to be "undetermined."

was afraid that "through cross-examination [Petit might] inadvertently become a State's expert."

Attorney Jones explained that Petit grew defensive when cross-examined at his deposition. After Petit's disappointing deposition, defense counsel tried to find a second fire expert for Yenger, but "it just wasn't going to happen." Siebrecht testified: "There were funding issues with the State. The group that we attempted to [hire] wanted, I believe, a $2,500 retainer. We talked to our boss, the State Public Defender, whether that was possible, and he informed us that the State does not do advanced payments."

Yenger also called fire investigator John Agosti as an expert witness at the PCR hearing. Agosti criticized the method Agent Shatzer used to analyze the fire scene and to determine potential causes for the fire. Agosti accused Shatzer of "confirmation bias" when he amended his report to conform to the incriminating statements from Jameson and Dye. Yet on cross-examination, Agosti acknowledged that the jury did not hear about the amended report.

Agosti also discussed the device that Yenger allegedly used to start the fire: "So Molotov cocktails are easy to make, but they don't work very well, and the glass bottle almost never is consumed by the fire." Building on that testimony, PCR counsel argued that it was "egregious" for trial counsel to assume that the jurors knew how the device worked: "You can't just throw something and have it go up like that."

After hearing from those three witnesses, the district court denied Yenger's application. He appeals.

## II.    Scope and Standard of Review

As a default setting, we review PCR proceedings for correction of legal error. *Johnson v. State*, 860 N.W.2d 913, 918 (Iowa Ct. App. 2014).  But often the unsuccessful applicant—like Yenger—will raise claims of ineffective assistance of counsel, calling for de novo review.  *See Smith v. State*, 7 N.W.3d 723, 725 (Iowa 2024).

## III.    Analysis

Yenger contends that he received ineffective assistance of counsel because his trial attorneys failed to call an expert witness to counter the testimony of Agent Shatzer and to challenge the State's theory that Yenger caused the house fire by throwing a Molotov cocktail.

Yenger bears the burden to show a breach of duty by trial counsel and resulting prejudice.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Under *Strickland's* first prong, "we measure counsel's performance against the standard of a reasonably competent practitioner."  *Linn v. State*, 929 N.W.2d 717, 731 (Iowa 2019).  We presume that attorneys Siebrecht and Michael performed their duties competently.  *See id.*  We measure their performance objectively by determining whether the representation was reasonable under prevailing professional norms, considering all the circumstances.  *See id.*  An unsuccessful trial strategy does not necessarily equate to a lapse in performance.  *See Smith*, 7 N.W.3d at 726.

Under the second prong, Yenger must show that his attorneys' failure to perform an essential duty resulted in prejudice.  *See Linn*, 929 N.W.2d at 731.  *Strickland* prejudice means a reasonable probability exists that but for the

attorneys' unprofessional error, the result of the proceeding would have been different. *See id.* That probability must be sufficient to undermine our confidence in the outcome. *Id.* Yenger must prove both prongs to merit relief. *See Strickland*, 466 U.S. at 697.

The district court decided that Yenger failed to prove either breach or prejudice. The court first described the attorneys' competent performance:

> Defense counsel was faced with the difficult decision of balancing the risks and benefits of calling Mr. Petit, when suddenly faced with the unexpected testimony of the State's expert witness Mr. Shatzer. The decision that defense counsel made not to call their own expert seems to the Court to be well within the realm of professional competence. Defense counsel ultimately determined that the potential risks to Mr. Yenger's case outweighed any potential benefits. The Court cannot disagree with this decision.

The court also noted that counsel effectively cross-examined Agent Shatzer, underscoring his opinion that he could not determine the cause of the fire to a reasonable degree of scientific certainty. And highlighting that his report listed several potential accidental causes. The agent also admitted on cross-examination that in his investigation of the fire scene he found no evidence of an accelerant such as gasoline. These observations are important because "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689.

The court emphasized counsel's strategic decision made in the heat of the moment not to call their expert to testify:

> Mr. Petit was at the trial, was available, and had previously been expected to testify. But the State's expert's surprise testimony that the cause of the fire was "undetermined" seemed about as good as it was going to get for the defense. It was clear at that point that Mr. Yenger was not going to be convicted on scientific testimony. Further testimony from the defense expert could muddy the waters,

open up damaging cross-examination, and unfavorably impress the jurors.

As its bottom line, the court concluded "defense counsel breached no essential duties in their attempts to portray the fire as accidental and not intentionally set." Reviewing all the circumstances of the defense's case, we reach the same conclusion. Attorneys Siebrecht and Jones made a reasonable calculation not to call their fire expert to testify. Because that choice followed "thorough investigation of law and facts relevant to plausible options" it is "virtually unchallengeable." *Id.* at 690.

Turning to the prejudice prong, the district court found there was no reasonable likelihood that the outcome of the trial would have been different if trial counsel had called an expert fire witness. Yenger contests that finding on appeal. He argues that "[a]n expert such as John Agosti could have effectively challenged the State's expert testimony that made it seem like there was an intentional starting of the fire." Yenger insists that a defense expert could have testified that Agent Shatzer's investigation did not follow a scientific method as described in fire safety manuals and the agent speculated about the possibility of an accelerant igniting the second floor of the house. And, according to Yenger, an expert could have pointed to Shatzer's "confirmation bias" when it came to ignoring alternative causes for the fire.

But as the State points out, even Agosti did not contend that the fire was accidental. He testified at the PCR hearing that he agreed with Agent Shatzer that the origin of the fire was undetermined. The defense strategy of not wanting to inadvertently bolster the State's case would have existed even with another expert.

The State also points to "strong evidence" of Yenger's guilt from non-expert sources. Those sources include the damning testimony of his companions, Dye and Jameson, as well as his own admission to a fellow inmate that he "firebombed" the house. After reviewing the totality of the evidence, we agree that Yenger cannot show that he was prejudiced by his defense attorneys' decision not to call their own fire expert.

Because Yenger failed to show either a breach of duty or resulting prejudice, we affirm the denial of postconviction relief.

**AFFIRMED.**